Docket No. 77771--Agenda 3--March 1996.

              THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.

                          OASBY GILLIAM, Appellant.

                         Opinion filed May 23, 1996.

     JUSTICE FREEMAN delivered the opinion of the court:

     Following a jury trial in the circuit court of Jefferson County,

defendant, Oasby Gilliam, was convicted of first degree murder, aggravated

kidnapping, and robbery. 720 ILCS 5/9--1(a)(1), 10--2(a)(3), 18--1(a) (West

1992). At a separate sentencing hearing, the same jury found defendant

eligible for the death penalty and further determined that there were no

mitigating circumstances sufficient to preclude imposition of that sentence.

     The trial court sentenced defendant to death on the murder conviction

and to concurrent, extended 30-year prison terms on the aggravated kidnapping

and robbery convictions. The death sentence has been stayed pending direct

review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603,

609(a). We affirm defendant's convictions and sentences.

                                   BACKGROUND

     Defendant was charged in a seven-count information with four counts of

first degree murder based on intent, recklessness, and the predicate felonies

of robbery and aggravated kidnapping; one count of aggravated kidnapping; and

two counts of robbery alleging the taking of an automobile and a wristwatch.

Defendant was tried on all counts.

     The State's evidence at trial was essentially as follows. On June 19,

1992, at approximately 2:15 p.m., bartender Russell Turner was alone at work

at Sovereign Liquors, at 6202 N. Broadway in Chicago. Defendant entered the

tavern and asked to use the restroom. Before he left, defendant put down a

plastic grocery bag and ordered a beer. The bag contained a paper bag that

held two bricks. When he returned, defendant changed his order. As Turner

leaned over to fill a glass with ice, defendant struck Turner over the head

with the bag, and a vicious struggle ensued. Defendant repeatedly pounded and

stamped on Turner and struck him with a brick and a liquor bottle.

     Turner eventually maneuvered himself such that he struggled to pull

defendant out the tavern door, while defendant pulled Turner to keep him

inside. Because Turner was covered in his own blood, defendant slipped out of

Turner's hands and Turner went out the door. Once Turner was outside,

defendant immediately ran out of the tavern. Defendant ran south on Broadway

and then west on nearby Granville Avenue.

     The victim in this case, Aileen D'Elia, lived on the first floor of a

two-flat building at 6223 N. Lakewood Avenue. The victim was 79 years old, 5

feet 2 inches tall, and wore dentures. She wore a Medic Alert bracelet,

wedding and engagement rings, a ring containing an aquamarine stone,

earrings, a wristwatch, and a silver bracelet. Also, the victim owned a brown

1986 Chevrolet Caprice. The car was in good condition because the victim kept

it in the garage behind her home.

     On June 19, 1992, between 2:20 and 2:40 p.m., the victim returned home,

driving her car onto a cement slab next to her garage. At approximately 4:30

p.m., the victim's granddaughter, who lived on the second floor of the

building, noticed that the victim's apartment door was ajar and her car was

missing.

     On July 1, the victim's corpse was found in a field near Illinois Route

15, approximately 2½ miles from Interstate 57, in Jefferson County. The body

was in a wooded area not visible from an access road 30 yards away. Near the

body, crime technicians found the victim's Medic Alert bracelet and dentures,

and a watch crystal. Technicians also found two plastic grocery bags from the

grocery store where the victim shopped. One of the bags had a red substance

with gray hairs on it. Subsequent laboratory examination revealed the hairs

to be consistent with those of the victim. The hairs were broken off at the

roots, consistent with having been struck by a blunt object. The victim's

identification and driver's license were subsequently found in a bushy area

next to an exit ramp of Interstate 57.

     The victim died from multiple skull fractures caused by multiple blows

to the head and face. The fractures were consistent with being struck by a

tire iron. Manual strangulation possibly contributed to the victim's death.

The victim may have lived for several hours after the attack.

     On the afternoon of June 20, 1992, defendant arrived in Greenwood,

Mississippi, to visit an aunt, Theresa Caruthers, and a cousin, Thelma Scott-

Robinson. Defendant drove a brown, four-door Chevrolet in good condition with

Illinois license plates. Robinson asked defendant about stains in the back

seat of the car that appeared to her to be blood. Defendant replied that

children had spilled juice on the seat. She also noticed "a costume jewelry

*** old-time Indian like ring" on the front seat of the car. Defendant said

that he bought it. At one point during his visit, defendant appeared to

Robinson to be nervous and restless. She asked him what was wrong and

defendant replied, "If you only knew."

     Chicago Police Detective Ray Kaminski investigated the attempted robbery

at Sovereign Liquors. The attack on Turner lasted approximately 10 to 15

minutes. Defendant struck Turner approximately 20 times in the head with a

brick. Turner received 48 stitches on his head at a nearby hospital.

Defendant's wallet was subsequently found in the tavern; the wallet contained

his identification and photograph. Turner subsequently identified defendant

from a photograph array and a police lineup, and in court. Although defendant

was charged with the attempted robbery of Turner, the charge was dismissed

when the State proceeded on the first degree murder charge in this case.

     Inspecting defendant's wallet, Kaminski found a slip for a nearby pawn

shop where defendant's girlfriend, Daphne "Trina" Townsend, worked. Townsend

told Kaminski that she had last seen defendant on the morning of June 19.

     Detective Kaminski also interviewed one of defendant's sisters, Jill

Traylor; defendant's employer, Charles Mickins; and Turner. The police then

sought through the Federal Bureau of Investigation (FBI) a federal warrant

for defendant's arrest. The police also contacted Caruthers in Greenwood.

Kaminski also maintained contact with Townsend and another of defendant's

sisters, Edna Bridges.

     During the week of August 11, 1992, defendant returned to Chicago and

stayed with Bridges. On the morning of August 18, defendant directed Bridges

and Townsend to telephone police and arrange for his surrender. Townsend

first attempted to telephone Chicago Police Detective Anne Chambers, who had

investigated the murder of Townsend's and defendant's son. Chambers had known

Townsend for approximately one year and had met defendant two days prior to

the victim's disappearance. Chambers, however, was not at the station.

Townsend then attempted to telephone Detective Kaminski, but he too was

unavailable. Bridges then telephoned Area 6 police headquarters and talked to

someone else.

     At approximately 12:30 p.m., Detective Kaminski and three additional

officers arrived at Bridges' apartment building. The officers arrested

defendant and, pursuant to Bridges' request, took him down the back stairs.

When they reached the squad car, Kaminski handcuffed defendant, gave him his

Miranda warnings, and put him in the car.

     Defendant arrived at Area 6 police headquarters at approximately 1:30

p.m. At approximately 1:30 a.m. on August 19, 1992, he confessed.

     Defendant's confession was essentially as follows. On June 19, 1992, as

defendant left a Broadway bus at Granville Avenue, he saw Turner enter

Sovereign Liquors. Defendant believed that Turner had punched defendant's

pregnant girlfriend in the stomach the preceding week. Defendant entered the

tavern with a brick and a fight ensued.

     As defendant ran out of the tavern, two unknown men chased him into an

alley. Defendant happened upon the victim getting in or out of her car. He

approached her and ordered her to get in the car. The victim did, with

defendant, who ordered her to drive. Defendant eventually ordered the victim

to drive to a parking area at the Foster Avenue beach. Defendant then ordered

the victim to get out of the car and to get in the trunk. She did, and

defendant locked her in the trunk.

     As defendant drove south on Interstate 57, he considered what to do with

the victim, who could identify him. Between 7:30 and 8 p.m., defendant exited

the interstate and drove to a field bordered by trees. He released the victim

from the trunk. While she stood near the car, defendant took a tire iron from

the trunk. Defendant then struck the victim two or three times on the head

with the tire iron. The victim fell to the ground, but continued to move.

Defendant struck the victim several more times on the head with the tire iron

until she was still. Defendant then dragged the victim into a wooded area. He

returned to the car, cleaned the tire iron, replaced it in the trunk, and

continued south on Interstate 57. Defendant also took $10 that he found in

the car.

     Defendant arrived in Greenwood, Mississippi, the next day. He stayed for

five or six hours and visited relatives. Defendant then drove to Dallas,

Texas, where he stayed for five weeks. At the end of that time, defendant

sold the victim's car for $150. The buyer subsequently told defendant that

the car was shipped to Mexico. It has never been found.

     After selling the victim's car, defendant traveled through Louisiana,

Mississippi, and Alabama. Defendant then took a bus to Chicago, where he

arrived on August 11, 1992. He stayed with Bridges until his surrender on

August 18.

     The defense case was essentially that the State failed to prove

defendant guilty of the charged offenses beyond a reasonable doubt. The

defense asserted that police coerced defendant into falsely confessing. At

the close of the evidence, the jury returned three general verdicts of

guilty, one each for first degree murder, aggravated kidnapping, and robbery.

     The same jury was instructed, inter alia, that defendant would be

eligible for the death penalty if it found that he killed the victim in the

course of committing another felony, in this case either robbery or

aggravated kidnapping. See 720 ILCS 5/9--1(b)(6) (West 1992). The jury

returned a general verdict finding that the statutory aggravating factor

existed and that defendant was eligible for the death penalty.

     At the second stage of the capital sentencing hearing, the State's case

in aggravation included the following evidence. In March 1984, in Greenwood,

Mississippi, defendant was convicted of burglary, i.e., stealing a car

stereo, and received a three-year sentence of probation. In November 1984,

defendant was convicted of residential burglary and received a four-year

sentence to the Mississippi State Penitentiary. Defendant's probation for the

prior conviction was revoked due to the subsequent burglary conviction.

Defendant was sentenced to a three-year concurrent prison term on the prior

conviction.

     In February 1991, defendant pled guilty to the May 1990 burglary of a

Chicago liquor store. Defendant received a four-year sentence of probation to

be monitored by the Treatment Alternative Street Crimes (TASC) program.

However, defendant failed to comply with the terms of his probation, and a

warrant was issued for his arrest.

     At approximately 4:30 a.m. on May 10, 1992, defendant entered a Kinko's

Copy Center at 6429 N. Sheridan Road in Chicago. Defendant and the assistant

manager, Rajun Callumkal, were alone. Defendant eventually forced Callumkal

down a hallway, beat him with a brick, and took his wallet and money from the

cash register. Callumkal received five or six stitches on his head. He

identified defendant from a photograph array and a subsequent police lineup.

     Defendant's case in mitigation included the following evidence. Rev.

Charles Mickins and his wife, Araina Mickins, owned a photocopy shop in

downtown Chicago. They provided photocopying services to area law firms and

similar businesses. From July 1991 to June 19, 1992, the Mickins employed

defendant at first as a machine operator and later as a supervisor. Defendant

was a good worker, was instrumental in the growth of the business, and

performed acts of kindness.

     According to two of defendant's sisters, Gloria and Jill Traylor,

defendant had four brothers and six sisters by different fathers. Defendant's

mother died when he was eight years old. Defendant lived with various aunts

in Mississippi and Chicago. Defendant was a father figure to Gloria and was

very close to Jill. Defendant gave both of them his attention and money.

     According to Townsend, defendant met her in 1990, and they began living

together approximately one year later. Defendant was considerate; he

performed housework when she was pregnant and tired. Approximately 2½ years

into their relationship, Townsend discovered that defendant had a drug

problem. Three or four months after defendant entered the TASC program, their

son, Oasby III, was murdered. Their second child, KeShara, was five days old

when defendant fled from Chicago. The Mickins, Jill Traylor, and Townsend all

testified that defendant was very upset when his son was beaten to death in

1991.

     At the close of the sentencing hearing, the jury found that there were

no mitigating circumstances sufficient to preclude imposition of the death

penalty. The trial court accordingly sentenced defendant to death on the

first degree murder conviction. The court also sentenced defendant to

concurrent, extended 30-year prison terms on the aggravated kidnapping and

robbery convictions.

     Defendant appeals. Additional pertinent facts will be discussed in the

context of the issues raised on appeal.

                                   DISCUSSION

     We will consider defendant's allegations of error in the sequence in

which the alleged errors occurred in the proceedings below.

                                    Pretrial

     Defendant contends: (1) his confession was involuntary; (2) the trial

court made two erroneous rulings regarding his motion to re-open the

suppression hearing; (3) venue properly laid in Cook County and not in

Jefferson County on the charge of robbery of the victim's car; and (4) the

trial court erroneously refused a jury instruction on venue tendered by the

defense.

                          Voluntariness of Confession

     Defendant claims that the trial court should have granted his motion to

suppress his confession because it was involuntary. The test for

voluntariness is not whether the accused wanted to confess or would have

confessed in the absence of interrogation. Suspects typically do not confess

to the police purely of their own accord, without any questioning. People v.

Terrell, 132 Ill. 2d 178, 198 (1989). Rather, the test of voluntariness is

whether the defendant made the statement freely, voluntarily, and without

compulsion or inducement of any sort, or whether the defendant's will was

overcome at the time he or she confessed. People v. Clark, 114 Ill. 2d 450,

457 (1986), citing People v. Prim, 53 Ill. 2d 62, 70 (1972).

     Whether a statement is voluntarily given depends upon the totality of

the circumstances. The question must be answered on the facts of each case;

no single fact is dispositive. Factors to consider when determining

voluntariness include: the defendant's age, intelligence, background,

experience, mental capacity, education, and physical condition at the time of

questioning; the legality and duration of the detention; the duration of the

questioning; and any physical or mental abuse by police, including the

existence of threats or promises. People v. Melock, 149 Ill. 2d 423, 447-48

(1992); see People v. Haymer, 154 Ill. App. 3d 760, 770 (1987) (collecting

cases).

     The State has the burden of establishing the voluntariness of the

defendant's confession by a preponderance of the evidence. The trial court's

determination of the voluntariness of a confession will not be disturbed on

review unless it is against the manifest weight of the evidence. People v.

Redd, 135 Ill. 2d 252, 292-93 (1990); Clark, 114 Ill. 2d at 457. We note that

in reviewing the trial court's finding, we may consider the entire record,

including trial testimony. People v. Stewart, 104 Ill. 2d 463, 480 (1984).

     The State's evidence was essentially as follows. Defendant arrived at

Area 6 police headquarters on August 19, 1992, at approximately 1:30 p.m.

Police placed defendant in an interview room and handcuffed him to a wall.

The handcuff wall rings were between 3½ and 4 feet above the floor, enabling

a person so handcuffed to sit in a chair. Defendant was handcuffed whenever

he was alone to prevent his escape or harm to himself. He was uncuffed at all

other times.

     At approximately 2 p.m., Detective Kaminski returned and again read

defendant the Miranda warnings, which were additionally printed on a notice

posted on the wall. Throughout the series of interrogations, defendant stated

that he understood the Miranda warnings whenever they were read to him.

Kaminski informed defendant that he was under arrest for the attempted

robbery of Sovereign Liquors and for the abduction and murder of Aileen

D'Elia. Kaminski spoke with defendant for about 10 to 15 minutes, and left

the room. He returned about 10 minutes later with Chicago Police Sergeant

Steve Peterson, who was assigned to the FBI Fugitive Task Force. They spoke

with defendant for about one-half hour.

     After that conversation, police asked Bridges and Townsend if they would

come to the station for questioning. The police wanted to know if defendant

had told Bridges and Townsend anything pertaining to the investigation. They

came voluntarily; police officers gave them a ride. Also during this time,

Detective Kaminski and the other officers involved contacted Russell Turner

and arranged a lineup for him to view, and made reports.

     At approximately 6:30 p.m., Detective Kaminski gave defendant two

bologna sandwiches and something to drink. Detective Kaminski then spoke with

Bridges and Townsend. At approximately 9 p.m., Turner identified defendant

from a lineup. At 10:30 p.m., Kaminski informed defendant that he was

identified in the attempted robbery of the tavern, and spoke with defendant

for about 10 minutes.

     At approximately 11 p.m., Detective Chambers arrived at the station. She

was contacted at about 9 p.m., and was told that Townsend had earlier tried

to contact her. Detective Chambers spoke with Townsend for about 10 minutes.

Chambers then entered the interview room, read to defendant the Miranda

warnings, and then spoke with defendant for about five minutes. Defendant

wanted to know if Townsend was at the station and what she had told police.

Defendant appeared to be normal and did not complain of physical or emotional

discomfort.

     Detective Chambers returned to Townsend. Defendant told Chambers that he

returned to Chicago that day, but Townsend told Chambers that he had returned

several days before. Townsend gave Chambers a note for defendant that read,

"Gil, I told them that you came back last Tuesday. I love you, Trina."

     Detective Chambers delivered the note to defendant. They spoke for about

one-half hour. Defendant spoke of the death of his son. Chambers asked

defendant about the victim, and he responded, "It was an accident. I didn't

mean to hurt the old lady or anyone else." Defendant then asked to speak to

Sergeant Peterson. Detective Chambers arranged to have a sandwich made for

defendant. She had no further contact with defendant. All of the officers

denied that they had threatened to arrest Townsend, or to have her and

defendant's infant daughter placed in foster care.

     At 1:30 a.m. on August 19, 1992, Sergeant Peterson read to defendant the

Miranda warnings, and then spoke with defendant alone for approximately one

hour. During this conversation, defendant confessed. At 2:45 a.m., Peterson

and Kaminski again spoke with defendant after reading him the Miranda

warnings. Defendant discussed the events relating to the murder for 30 to 40

minutes. He also drew a map of where he killed the victim and left her body,

and another map of where he sold the victim's car in Dallas.

     At 4 a.m., Detective Kaminski returned with Assistant State's Attorney

Kenneth Zelazo. Zelazo read to defendant the Miranda warnings, and spoke with

defendant for about an hour. Kaminski then left the room at Zelazo's request.

Zelazo then asked defendant if he had any complaints about how police

officers had treated him. Defendant had no complaints; he ate, drank, and

used the restroom whenever he wanted.

     Zelazo left the interview room for about an hour to write a summary of

defendant's confession. Defendant read, understood, and signed a written

waiver of his Miranda rights. He and Zelazo reviewed every word on every page

of the six-page statement; defendant signed each page.

     Defendant claimed that his confession was involuntary. He alleged that

his repeated requests for counsel were ignored. He also alleged that he was

coerced into falsely confessing under threats against his family.

     On August 18, 1992, defendant surrendered to police because he knew that

he was a suspect in the attempted robbery of Sovereign Liquors and the

victim's abduction and murder. At the police station, defendant refused to

talk to police until he had spoken with an attorney. Nevertheless, police

repeatedly interrogated him. Further, defendant read only the first page of

the written confession. He merely glanced at the remaining pages; he never

read every word on every page.

     Defendant also testified concerning his physical condition. Defendant

used the restroom for the first time since his arrest only after he signed

the written confession. However, defendant did not need or request to use the

restroom because he was concerned with Townsend. Defendant requested food but

was given none. Also, Zelazo did not ask defendant about how police officers

treated him. By the time defendant signed the written confession, he had been

awake for about 24 hours.

     Bridges estimated that she and Townsend were kept at the police station

for 18 hours; Townsend estimated their stay at 24 hours. They were placed in

separate rooms; defendant was brought to a window in each room to show him

that they were there.

     Police officers threatened defendant that they would arrest Bridges and

Townsend for concealing him. They also threatened that the Department of

Children and Family Services (DCFS) would take Bridges' children and Townsend

and defendant's infant daughter. Additionally, Detective Chambers asked

Townsend to write two notes to defendant. The second note informed defendant

that Townsend was still there, and that Chambers had threatened to arrest her

for concealing him and to place their daughter in the care and custody of

DCFS.

     At the close of the suppression hearing, the trial court denied

defendant's motion to suppress his confession. The court expressly stated

that it believed the State's witnesses and disbelieved defendant's. The court

specifically found that defendant's testimony was unbelievable. The court

also specifically found that the length of the detention was reasonable based

on the other investigations that the police were conducting.

     After reviewing the entire record, we uphold the trial court's

determination that defendant's confession was voluntary. The trial court

plainly found the State's witnesses to be more credible, and rejected

defendant's explanation for his statement. The credibility of the witnesses

regarding the voluntariness of a statement is to be determined by the trial

court and that determination will not be reversed unless against the manifest

weight of the evidence. People v. Ramey, 152 Ill. 2d 41, 58 (1992). We cannot

say that the trial court's findings were against the manifest weight of the

evidence.

                         Reopening Suppression Hearing

     Defendant moved the trial court to reconsider its denial of his motion

to suppress, and to order a psychiatric examination to determine whether he

was especially vulnerable to psychological coercion. On April 20, 1993, the

trial court held a hearing on the motion, at which Bridges and Charles

Mickins testified in offers of proof. At the close of the hearing, the trial

court denied defendant's motion.

     Defendant claims that the trial court erred in: (a) refusing to reopen

the suppression hearing or reconsider its determination that his statement

was voluntary; and (b) refusing his request for a psychiatric examination.

     The general rule is that collateral estoppel bars a rehearing on a

motion to suppress in the same proceeding. People v. Holland, 56 Ill. 2d 318,

321 (1974) (citing People v. Armstrong, 56 Ill. 2d 159 (1973), and People v.

Hopkins, 52 Ill. 2d 1 (1972)). The only exception to the bar is where the

defendant shows "exceptional circumstances or any evidence in addition to

that submitted upon the first hearing which had become available for

submission in connection with the motion to suppress." Holland, 56 Ill. 2d at

321.

     Defendant argues that his proffered evidence and his request for a

psychiatric examination was "evidence in addition to that submitted upon the

first hearing." Defendant argues that Holland's exception to the collateral

estoppel bar requires only additional evidence and not newly discovered

evidence. Thus, according to defendant, the trial court should have granted

the rehearing.

     This argument lacks merit. Holland plainly describes the evidence

necessary to escape the collateral estoppel bar as additional evidence "which

had become available for submission." It necessarily follows that such

evidence was not available at the first suppression hearing, i.e., newly

discovered evidence. The appellate court has so interpreted Holland. See,

e.g., People v. Johnson, 100 Ill. App. 3d 707, 709 (1981) (collecting cases).

     In the present case, none of defendant's proffered evidence was newly

discovered since the suppression hearing. Similarly, defendant could have

requested a psychiatric examination when he filed his original suppression

motion. We cannot say that the trial court erred in denying defendant's

motion to reconsider its denial of defendant's motion to suppress.

                          Venue: Robbery of Automobile

     Defendant next claims that venue on the charge of robbery of the

victim's car properly lay in Cook County and not in Jefferson County. Defen-

dant notes that, generally, "[c]riminal actions shall be tried in the county

where the offense was committed, except as otherwise provided by law." 720

ILCS 5/1--6(a) (West 1992). Defendant contends that the offense of robbery of

the victim's car was completed in Chicago, where he forced her into her car,

forced her to drive to a parking area at the Foster Avenue beach, and then

forced her into the car's trunk. Defendant asks this court to reverse his

conviction of robbery of the victim's car.

     We disagree and hold that defendant was properly tried for robbery of

the victim's car in Jefferson County. We reach this conclusion after

comparing the offense of theft and its accompanying venue rule with the

robbery that was committed in this case.

     A person commits theft when he or she knowingly: obtains or exerts

unauthorized control over property of the owner, obtains control over such

property by deception or by threat, or obtains control of property which he

or she knows to be stolen; and intends to keep the property from its owner.

720 ILCS 5/16--1(a) (West 1992). A person commits robbery when he or she

takes property from the person or presence of another by the use of force or

by threatening the imminent use of force. 720 ILCS 5/18--1(a) (West 1992).

     Theft requires knowledge that the taking is unauthorized and an intent

to permanently deprive the owner of the use or benefit of the property.

However, robbery does not require a similar showing of intent. The essence of

theft is an intended taking of property, while the essence of robbery is the

use of force in the taking of the property, regardless of intent. People v.

McCarty, 94 Ill. 2d 28, 33 (1983). "Thus, if no force or threat of imminent

force is used in the taking, there is no robbery, although the act may

constitute a theft." People v. Patton, 76 Ill. 2d 45, 48 (1979).

     Turning to venue, a person who commits theft of property may be tried in

any county in which he or she exerted control over such property. 720 ILCS

5/1--6(g) (West 1992). The venue rule for theft accords with the common law.

Courts have long reasoned that where property is intentionally taken from one

county to another county, or through several counties, the defendant commits

a new taking. In other words, the defendant continues the essence of the

crime, i.e., the intentional taking. The defendant continues to be as guilty

of theft in the subsequent county as when and where the property was first

taken. People v. Devore, 402 Ill. 336, 337-38 (1949).

     This reasoning applies in this case. Of course, the offense of robbery

is complete when force or threat of force causes the victim to part with

possession or custody of property against the victim's will. People v. Smith,

78 Ill. 2d 298, 303 (1980). Thus, defendant's robbery of the victim's car was

completed in Cook County, in the alley behind the victim's home when he

forced her into the car to drive him away. However, defendant's taking of the

victim's car, with the victim forced in the car trunk, continued the essence

of the robbery, i.e., the use of force. We note that other states commonly

include robbery in their venue rules for theft. See 1 C. Torcia, Wharton's

Criminal Procedure §39 (13th ed. 1989).

     Defendant continued to be as guilty of robbery in the field in Jefferson

County as when the robbery occurred in Cook County. Therefore, we hold that

defendant was properly tried in Jefferson County for the robbery of the

victim's car.

                            Venue: Jury Instruction

     In a related claim, defendant contends the trial court erred by refusing

to instruct the jury on venue. Defendant tendered Illinois Pattern Jury

Instructions, Criminal, No. 2.07 (3d ed. 1992) (hereafter IPI Criminal 3d),

which, modified for this case, read: "The State must prove beyond a

reasonable doubt that the offenses of first degree murder, aggravated

kidnapping, and robbery occurred in Jefferson County, Illinois."

     If the evidence raises a question of the propriety of venue, the jury

must be instructed that the State is required to prove beyond a reasonable

doubt that each element of the charged offense occurred in the county in

which the crime was alleged to have been committed. However, there is no need

to so instruct the jury where venue was not a controverted issue in the case.

People v. Anderson, 355 Ill. 289, 303 (1934); see People v. Turner, 179 Ill.

App. 3d 510, 520 (1989).

     In the present case, the evidence did not raise a question of the

propriety of venue. We previously held that defendant continued to be guilty

of robbery in Jefferson County. In view of that holding, we further hold that

the trial court did not err in refusing to instruct the jury on venue.

                                  Guilt Phase

     Defendant contends he was denied a fair trial for the following reasons.

The trial court erroneously: (1) excused for cause a venireperson who

unequivocally could impose death; (2) limited the evidence that defendant

could present to the jury about the circumstances surrounding his confession;

and (3) admitted evidence of other crimes. Also, (4) the State did not prove

beyond a reasonable doubt the offense of robbery of the victim's wristwatch.

                      Witherspoon Excusal of Venireperson

     Relying on Witherspoon v. Illinois, 391 U.S. 510, 20 L. Ed. 2d 776, 88

S. Ct. 1770 (1968), defendant contends the trial court erred in excusing

venireperson Scott for cause. Witherspoon and its progeny provide that the

right to an impartial jury, guaranteed by the sixth and fourteenth amendments

to the United States Constitution, prohibits the exclusion of venirepersons

for cause in capital cases because they express only general objections to

the death penalty. People v. Brisbon, 129 Ill. 2d 200, 224-25 (1989); People

v. Mahaffey, 128 Ill. 2d 388, 416 (1989). Defendant seeks a new capital

sentencing hearing.

     The State initially responds that defendant waived this issue for

review. The record shows that defendant both contemporaneously objected to

the excusal and included this specific averment in his written post-trial

motion, alleging: "This court erred in granting the State's Motion to Excuse

Prospective Juror Scott based on the Witherspoon decision." However, the

State argues that defendant was required to allege that the error violated

his rights under the sixth and fourteenth amendments to preserve the issue

for review.

     The State's waiver argument lacks merit. To preserve an issue for

review, a defendant must both contemporaneously object at trial and include

the alleged error in a written post-trial motion. The failure to raise an

issue in a written post-trial motion constitutes a waiver of the issue and it

cannot be considered on appeal. People v. Enoch, 122 Ill. 2d 176, 186-87

(1988). Specific references in post-trial motions to the reasons why a trial

judge's actions or rulings were wrong enable the judge to reconsider their

propriety in a less pressured environment. If prejudicial error actually

occurred, the judge can order a new trial, thus avoiding the delay and

expense of appellate review. People v. Jackson, 84 Ill. 2d 350, 359 (1981).

The emphasis is necessarily factual and is not aided by mere constitutional

citations. See, e.g., People v. Turk, 101 Ill. App. 3d 522, 532-33 (1981).

     Applying these principles to the present case, it is clear that

defendant preserved this issue for review. In his written post-trial motion,

he identified the specific event giving rise to the alleged error, with a

reference to Witherspoon. An additional citation to the sixth and fourteenth

amendments would not have assisted the trial court in considering the

allegation.

     Turning to the merits, defendant contends that the trial court

erroneously excused venireperson Scott for cause. According to defendant,

although Scott voiced general objections to the death penalty, he

unequivocally could impose it. A venireperson who opposes the death penalty

may not be excused for cause unless his or her views would prevent or

substantially impair the performance of the venireperson's duties as a juror

in accordance with his or her instructions and oath. People v. Pitsonbarger,

142 Ill. 2d 353, 381, 385 (1990); Mahaffey, 128 Ill. 2d at 416.

     A venireperson's remarks must not be considered in isolation, but as a

whole. Also, the trial court is in a superior position to evaluate a

venireperson's response. People v. Gaines, 88 Ill. 2d 342, 357 (1981). The

determination whether to allow a challenge for cause is committed to the

sound discretion of the trial court. People v. Seuffer, 144 Ill. 2d 482, 502

(1991).

     The record shows that the trial court began Scott's voir dire with

general questions, to which Scott responded that he would be fair to both

defendant and the State, and would follow the court's instructions on the law

regardless of his personal feelings. During questioning by a prosecutor,

Scott responded that he was strongly against the death penalty, and that he

did not "believe in taking another person's life." Further, based on the

strength of his personal beliefs, Scott would automatically reject the death

penalty no matter what facts were found at trial.

     Scott was then questioned by defense counsel, requestioned by a

prosecutor, and then further questioned by the trial court. Scott stated that

the only circumstance under which he could vote for the death penalty would

be the murder of a law enforcement officer. He repeatedly stated that, in all

other cases, he would automatically vote against the death penalty. He would

not consider the aggravating and mitigating circumstances, and would

disregard the trial court's instructions on the law.

     After reviewing the record, we uphold the trial court's excusal of

venireperson Scott for cause. Scott repeatedly stated that he would disregard

the evidence and the law and would automatically vote against the death

penalty. His sole potential exception to his opposition, the murder of a law

enforcement officer, did not ameliorate his intransigence. See People v.

Ganus, 148 Ill. 2d 466, 474-75 (1992). We cannot say that the trial court

abused its discretion in excusing Scott.

                     Limiting Evidence Regarding Confession

     Defendant claims that the trial court erroneously limited the evidence

that he could present to the jury on the circumstances surrounding the

confession. In an offer of proof, Dr. Michael Althoff, an examining psycholo-

gist, opined that defendant's desire to protect his family made him

especially susceptible to police pressures and created a form of

psychological compulsion to confess. Thus, according to Dr. Althoff,

defendant's confession was the product of psychological coercion.

     The trial court granted the State's motion in limine to limit Dr.

Althoff's testimony. The court ruled that Dr. Althoff could testify on

defendant's mental state or condition, but could not testify on the

circumstances surrounding the voluntariness or competency of defendant's

confession.

     It is settled that the admissibility of a confession that is challenged

on the ground that it is involuntary is a matter for the trial court to

determine in the first instance out of the presence of the jury. If the court

rules that the confession is voluntary and admissible in evidence, the

defendant still has the right to present evidence to the jury that affects

the credibility or weight to be given the confession. People v. Cook, 33 Ill.

2d 363, 369-70 (1965); People v. Wagoner, 8 Ill. 2d 188, 197 (1956); accord

Crane v. Kentucky, 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142 (1986).

     However, this right of defendant does not diminish the general rule that

the admission of evidence is within the sound discretion of the trial court,

and its ruling will not be reversed absent abuse of that discretion. People

v. Ward, 101 Ill. 2d 443, 455-56 (1984); accord Crane, 476 U.S. at 689-90, 90

L. Ed. 2d at 644-45, 106 S. Ct. at 2146. Generally, expert testimony is

admissible when the expert testifies to matters that are beyond the common

knowledge of ordinary citizens, and where such testimony will aid the fact

finder in reaching its conclusion. People v. Jordan, 103 Ill. 2d 192, 208

(1984); People v. Free, 94 Ill. 2d 378, 411 (1983). Conversely, expert

testimony is not admissible on matters of common knowledge unless the subject

is difficult to understand and explain. Hernandez v. Power Construction Co.,

73 Ill. 2d 90, 98-99 (1978).

     In the present case, we conclude that the trial court properly limited

the testimony of Dr. Althoff. Whether defendant falsely confessed to protect

his family is not a concept beyond the understanding of ordinary citizens,

and is not difficult to understand or explain. See People v. Slago, 58 Ill.

App. 3d 1009, 1015-16 (1978); accord People v. Lambrecht, 231 Ill. App. 3d

426, 438-39 (1992); People v. Elder, 219 Ill. App. 3d 223, 225-27 (1991).

Further, we note that defendant was not precluded from challenging the

credibility of his confession. The jury could have reached the same

conclusion as Dr. Althoff based on the facts imparted through the testimony

of other witnesses. We cannot say that the trial court abused its discretion

by limiting the testimony of Dr. Althoff.

                            Evidence of Other Crimes

     Defendant next contends that the trial court erred by allowing Detective

Kaminski to refer to defendant's other crimes. Evidence of other crimes

committed by a defendant is not admissible if it is relevant merely to

establish the defendant's propensity to commit crime. However, evidence of

other crimes may be admitted if relevant to establish any material question

other than the defendant's propensity to commit crime. People v. Stewart, 105

Ill. 2d 22, 61-62 (1984).

     The record shows that prior to trial, the trial court granted

defendant's motion in limine to exclude evidence that, prior to the attempted

robbery of Sovereign Liquors, he robbed a Kinko's Copy Center. At trial,

Detective Kaminski, describing the course of the investigation, testified

that at 9 p.m. on August 18, 1992, "lineups were conducted." During cross-

examination, defense counsel questioned Kaminski regarding the length of

defendant's detention. Defense counsel asked Kaminski whether he brought

defendant back for "another" lineup. Kaminski responded in the negative.

During redirect examination, the following colloquy occurred:

               "Q. Detective Kaminski, you stated that you were making

          arrangements for a lineup; is that correct?

               A. Yes, sir.

               Q. As a matter of fact, there were two separate lineups?

               A. That's correct.

               Q. One totally unrelated to the investigation?

               A. Yes, sir.

               Q. And you had to obtain people to stand in the lineup and

          also people to view the lineup; is that correct?

               A. That's correct.

               Q. And did that take a period of time?

               A. Yes."

     We conclude that Detective Kaminski's testimony was admissible.

Defendant contended that his lengthy detention contributed to the coercion

that resulted in his false confession. Kaminski's testimony was relevant to

establish a legitimate reason for the detention, and thereby undermine

defendant's claim of coercion. See People v. King, 109 Ill. 2d 514, 530-31

(1986).

               Sufficiency of the Evidence: Robbery of Wristwatch

     Defendant also claims that the State failed to prove beyond a reasonable

doubt the offense of robbery of the victim's wristwatch. Of course, the State

carries the burden of proving beyond a reasonable doubt each element of the

offense and the defendant's guilt. People v. Ware, 23 Ill. 2d 59, 62 (1961).

     Where a criminal conviction is challenged based on insufficient

evidence, a reviewing court, considering all of the evidence in the light

most favorable to the prosecution, must determine whether any rational fact

finder could have found beyond a reasonable doubt the essential elements of

the crime. A criminal conviction will not be set aside unless the evidence is

so improbable or unsatisfactory as to create a reasonable doubt of the

defendant's guilt. People v. Eyler, 133 Ill. 2d 173, 191 (1989). This

standard of review applies in all criminal cases, whether the evidence is

direct or circumstantial. People v. Pintos, 133 Ill. 2d 286, 291 (1989).

     A person commits robbery when he or she takes property from the person

or presence of another by the use of force or by threatening the imminent use

of force. 720 ILCS 5/18--1(a) (West 1992). Defendant contends that there is

no evidence that he took the victim's wristwatch. Defendant notes that the

only evidence that a watch was taken was a watch crystal found near the

victim's body. Defendant argues that the watch could have dislodged while the

victim was beaten to death, or dragged into the wooded area. Indeed,

defendant argues that crows could have carried away the watch.

     It is the function of the jury to assess the credibility of the

witnesses, the weight to be given their testimony, and the inferences to be

drawn from the evidence. People v. Peeples, 155 Ill. 2d 422, 487 (1993). The

jury in this case was not required to accept any possible explanation

compatible with defendant's innocence and elevate it to the status of

reasonable doubt. See People v. Herrett, 137 Ill. 2d 195, 206 (1990). The

jury may have rationally concluded that defendant took the victim's watch,

just as he took her car, her aquamarine ring, and her money. Although

defendant asks why he would take a watch without a crystal, the jury may have

rationally concluded that defendant broke the watch in the process of taking

it. After reviewing the entire record in the light most favorable to the

prosecution, we cannot say that the evidence was so improbable or

unsatisfactory that no rational factfinder could have found defendant guilty

beyond a reasonable doubt of the robbery of the victim's wristwatch.

                                   Sentencing

     Defendant contends he was denied a fair capital sentencing hearing for

the following reasons. At the first stage of the hearing: (1) defendant may

have been found eligible for the death penalty solely because of an invalid

robbery conviction. At the second stage of the hearing: the trial court (2)

limited the testimony of a mitigation witness and (3) refused to allow the

defense to make the final argument; (4) the prosecutor made improper and

prejudicial remarks during closing argument; the trial court (5) refused to

allow defendant to address the jury in allocution and (6) refused defense-

tendered jury instructions; (7) the pattern jury instructions given at both

stages of the capital sentencing hearing failed to guide the jury's

discretion. Defendant also contends (8) his extended sentence for robbery was

based on an impermissible double enhancement.

                        Invalid Death Eligibility Factor

     Defendant contends that the jury found him eligible for the death

penalty based on an invalid aggravating factor. The record shows that the

jury was instructed that it could find defendant eligible for the death

penalty if defendant committed the murder in the course of another felony,

specifically, if "the other felony was one or more of the following: robbery;

aggravated kidnapping." The State introduced as evidence the signed general

verdict of guilty on the two counts of robbery of the victim's car and watch,

in addition to the general verdicts of guilty of aggravated kidnapping and

first degree murder. The jury returned a general verdict stating, "We

unanimously find beyond a reasonable doubt that the statutory aggravating

factor exists."

     Defendant earlier challenged his conviction of robbery of the victim's

watch based on the sufficiency of the evidence. Continuing this claim,

defendant now argues that the jury may have relied solely on this

insufficient ground.

     The record shows that defendant did not include this claim in his post-

trial motion; thus the issue is waived. People v. Easley, 148 Ill. 2d 281,

337 (1992); People v. Young, 128 Ill. 2d 1, 38-40, 58 (1989). Further,

defendant cannot be heard to complain of the general verdict of eligibility

because it was defense counsel who tendered the verdict form. See People v.

Smith, 71 Ill. 2d 95, 104 (1978).

                     Limiting Mitigation Witness Testimony

     Defendant next contends the trial court erred by preventing Charles

Mickins from testifying how he would be affected by defendant's execution.

Defendant notes that victim impact evidence is now admissible at a capital

sentencing hearing to show the harm that a defendant has caused. People v.

Howard, 147 Ill. 2d 103, 155-58 (1991). Defendant reasons that "[e]vidence of

the effect that the defendant's execution will have upon his family and

friends should now be admissible."

     However, the record shows that defendant did not include this claim in

his post-trial motion; thus the issue is waived. People v. Chevalier, 131

Ill. 2d 66, 77 (1989). Defendant further asks this court to consider the

issue under the plain error doctrine of Supreme Court Rule 615(a) (134 Ill.

2d R. 615(a)). Plain error is a narrow and limited exception to the general

waiver rule, to be invoked only where the evidence is closely balanced or the

alleged error is so substantial that it deprived the defendant of a fair

trial. People v. Hampton, 149 Ill. 2d 71, 100 (1992). After reviewing the

record, we conclude that neither prong of the plain error rule is satisfied.

                           Final Argument for Defense

     Defendant next claims that the trial court erred by not allowing the

defense to make the opening and rebuttal arguments to the jury at the second

stage of the capital sentencing hearing. We have previously rejected this

contention. People v. Tenner, 157 Ill. 2d 341, 382 (1993).

                         Prosecutor's Improper Remarks

     Defendant contends he was denied a fair capital sentencing hearing also

because the prosecutor made improper and prejudicial remarks during closing

argument. Defendant characterizes the remarks as referring to the victim's

rights. This court has held that such argument distracts the jury from its

proper focus on the evidence of the defendant's guilt. People v. Smith, 152

Ill. 2d 229, 267-68 (1992); People v. Kokoraleis, 132 Ill. 2d 235, 285

(1989).

     However, the record shows that defendant failed both to

contemporaneously object to the remark, and to include the specific alleged

error in his post-trial motion. Thus, the issue is waived. Herrett, 137 Ill.

2d at 209. After reviewing the record, we further conclude that this issue

does not warrant our consideration under the plain error rule. See Smith, 152

Ill. 2d at 268-69; Kokoraleis, 132 Ill. 2d at 285.

                                   Allocution

     Defendant next contends that the trial court erred in not allowing him

to address the jury in allocution. We have repeatedly rejected this

contention. Tenner, 157 Ill. 2d at 381-82; Kokoraleis, 132 Ill. 2d at 280-82.

                          Refusal of Jury Instructions

     Defendant next contends that the trial court erred in refusing to submit

to the jury 16 tendered jury instructions. The defendant, like the State, is

entitled to the submission of appropriate jury instructions on the law that

applies to the defendant's theory of the case if there was evidence in the

record to support that theory. However, it is for the trial court to

determine, after considering the facts and the governing law, whether the

jury should be instructed on a particular subject. If an appropriate IPI

instruction exists, it must be used. People v. Lewis, 165 Ill. 2d 305, 354-55

(1995); see People v. Tsombanidis, 235 Ill. App. 3d 823, 837-38 (1992).

     The decision whether to give a non-IPI instruction rests within the

sound discretion of the trial court. People v. Sanchez, 115 Ill. 2d 238, 282

(1986). An abuse of discretion in the refusal of a non-IPI instruction occurs

only where there is no IPI instruction that applies to the subject on which

the jury should have been instructed. Conversely, a trial court does not

abuse its discretion by refusing to give a non-IPI instruction if there is an

applicable IPI instruction or the essence of the refused instruction is

covered by other given instructions. Tsombanidis, 235 Ill. App. 3d at 838.

     Defense Instruction 1, inter alia, allowed the jury to consider "any

feelings or mercy or compassion you wish to extend toward the defendant." The

trial court properly submitted to the jury IPI Criminal 3d No. 7C.01, which

accurately states the law. The tendered instruction was erroneous. See People

v. Spreitzer, 123 Ill. 2d 1, 41-43 (1988); People v. Emerson, 122 Ill. 2d

411, 442-43 (1987).

     Defense Instruction 3 sought to replace language in IPI Criminal 3d No.

7C.05, which defendant considers "hopelessly opaque." The IPI instruction

accurately reflects section 9--1(g) of the Criminal Code (720 ILCS 5/9--1(g)

(West 1992)). Defense Instructions 10, 15, 16, and 18 were likewise

unnecessary.

     Defendant tendered several instructions that attempted to define the

term "mitigating factor." However, the trial court properly submitted to the

jury IPI Criminal 3d No. 7C.06. Defense Instructions 5, 7, 9, 11, and 13 were

unnecessary.

     Defendant also tendered two instructions that defined the quantum of

mitigating evidence necessary for a nondeath verdict. However, IPI Criminal

3d No. 7C.05 adequately stated that law. Defense Instructions 6 and 8 were

unnecessary.

     Additionally, Defense Instructions 14 and 17 were mere rewordings of IPI

Criminal 3d No. 7C.06 and Defense Instruction 12 did not accurately state the

law. See People v. Sutherland, 155 Ill. 2d 1, 29 (1992). We cannot say that

the trial court abused its discretion in refusing these instructions.

                      Adequacy of Sentencing Instructions

     Defendant next claims that the instructions given at the capital

sentencing hearing violated his constitutional rights. U.S. Const., amends.

VIII, XIV. He contends that the jury instructions failed to adequately guide

the jury in deciding whether to impose the death penalty. Defendant seeks a

new sentencing hearing, based on United States ex rel. Free v. Peters, 806 F.

Supp. 705 (N.D. Ill. 1992).

     However, that decision has been reversed and its reasoning rejected.

Free v. Peters, 12 F.3d 700 (7th Cir. 1993); accord Gacy v. Welborn, 994 F.2d

305 (7th Cir. 1993). We have repeatedly agreed with this conclusion. People

v. Coleman, 168 Ill. 2d 509, 552 (1995); People v. Mahaffey, 165 Ill. 2d 445,

471 (1995).

                      Robbery Sentence: Double Enhancement

     Defendant next contends his 30-year extended sentence for robbery was

based in part on an impermissible double enhancement. Because the victim was

over the age of 60, the offense of robbery was enhanced from a Class 2 felony

to a Class 1 felony. See 720 ILCS 5/18--1(b) (West 1992). At the sentencing

hearing, the trial court mentioned the victim's age again as a reason for

imposing an extended sentence. See 730 ILCS 5/5--5--3.2(b)(4)(ii), 5--8--

2(a)(3) (West 1992). Defendant asks us to vacate the robbery sentence and

remand for a new sentencing hearing.

     It is settled that an element that is inherent to the criminal offense

of which a defendant has been convicted cannot be used also to extend the

prison sentence on the conviction. Using the same element that defines the

offense also to impose an extended sentence constitutes an impermissible

double use of a single factor. People v. Hicks, 164 Ill. 2d 218, 235 (1995).

     The following principles are equally settled:

          " `[R]eliance on an improper factor in aggravation does not always

          necessitate remandment for resentencing. Where the reviewing court

          is unable to determine the weight given to an improperly considered

          factor, the cause must be remanded for resentencing. [Citations.]

          However, where it can be determined from the record that the weight

          placed on the improperly considered aggravating factor was so

          insignificant that it did not lead to a greater sentence,

          remandment is not required. [Citations.]' " People v. White, 114

          Ill. 2d 61, 67 (1986), quoting People v. Bourke, 96 Ill. 2d 327,

          332 (1983).

     Applying these principles to the present case, we uphold defendant's 30-

year extended sentence for robbery. Initially, defendant is correct that the

trial court improperly mentioned the victim's age as an aggravating factor

justifying an extended sentence. However, the trial court specifically gave

two findings for the extended sentence: the fact that the victim was over 60

years old, and also that the offense was accompanied by exceptionally brutal

or heinous behavior indicative of wanton cruelty. See 730 ILCS 5/5--5--

3.2(b)(2) (West 1992).

     Further, prior to finding the presence of those two aggravating factors,

the trial court considered many other aggravating and mitigating factors.

While so doing, the court again mentioned the serious harm that defendant

caused the victim. The court also considered defendant's prior criminal

activity in Mississippi and in Chicago. The trial court's findings in their

entirety show that the improper aggravating factor of the victim's age did

not lead to the extended sentence, and that other aggravating factors support

the extended sentence for robbery. See People v. Hicks, 101 Ill. App. 3d 238,

244 (1981); People v. Devine, 98 Ill. App. 3d 914, 926-27 (1981).

                   Constitutionality of Death Penalty Statute

     Defendant contends that the Illinois death penalty statute violates the

eighth and fourteenth amendments to the United States Constitution for three

reasons. However, this court has previously rejected these arguments in other

cases; we see no reason to reach a different result here.

     First, the death penalty statute does not place an unconstitutional

burden of proof on a defendant that precludes meaningful consideration of

mitigating circumstances. People v. Page, 155 Ill. 2d 232, 283 (1993); People

v. Simms, 143 Ill. 2d 154, 183-84 (1991). Second, the death penalty statute

is not invalid because it allows the sentencer to consider nonstatutory

aggravating circumstances. People v. Perez, 108 Ill. 2d 70, 97-98 (1985);

People v. Stewart, 105 Ill. 2d 22, 75 (1984). Third, the death penalty

statute sufficiently minimizes the risk of arbitrarily or capriciously

imposed death sentences. This court has repeatedly reached this conclusion

after considering various aspects of the statute separately or cumulatively.

Tenner, 157 Ill. 2d at 390; Page, 155 Ill. 2d at 283-85; Simms, 143 Ill. 2d

at 185.

                                   CONCLUSION

     For the foregoing reasons, the judgment of the circuit court of

Jefferson County is affirmed. The clerk of this court is directed to enter an

order setting Thursday, November 14, 1996, as the date on which the sentence

of death entered in the circuit court is to be imposed. The defendant shall

be executed in the manner provided by law. 725 ILCS 5/119--5 (West 1992). The

clerk of this court shall send a certified copy of the mandate in this case

to the Director of Corrections, the warden of Stateville Correctional Center,

and the warden of the institution where defendant is now confined.

                                                                       Affirmed.