THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRADLEY L. ADAMS, Defendant-Appellant.

Fourth District No. 4—96—0525

Argued December 16, 1997.—Opinion filed December 10, 1999.

Daniel D. Yuhas and Jeff Page, both of State Appellate Defender's Office, of Springfield, for appellant.

Patrick W. Kelley, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Jeffrey K. Davison, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

After a jury trial in April 1996, defendant, Bradley Adams, was found guilty of four counts of first degree murder, one count of aggravated battery, and one count of concealment of a homicide. 720 ILCS 5/9—1(a), 12—4(a), 9—3.1 (West 1994). In June 1996, the court vacated the aggravated battery conviction and imposed an extended term of 65 years' imprisonment for first degree murder and a consecu-

tive 5-year term for concealment of a homicide. Defendant appeals, arguing (1) the trial court abused its discretion in admitting evidence of his prior misconduct; (2) the trial court erred in failing to compel the testimony of a defense witness; (3) the State improperly commented on his postarrest silence; (4) the evidence was insufficient to support his conviction for first degree murder; and (5) the trial court improperly considered an aggravating factor in imposing his sentence. We affirm in part, vacate in part, and remand with directions.

## I. BACKGROUND

In August 1995, defendant was charged with first degree murder, aggravated battery, and concealment of a homicide in connection with the February 1995 death of his girlfriend, Molly Sullivan. In March 1996, the trial court held a pretrial hearing on a motion by the State to admit evidence of defendant's prior misconduct. At the hearing, the State called Eva Golterman to testify about an incident between her and defendant in the fall of 1993.

In October 1993, Golterman and defendant were engaged to be married and lived in separate units at the Park West Apartment complex (Park West) in Springfield, Illinois. Golterman described an incident when she and defendant were leaving Park West. Golterman stopped to check her mail and found a letter addressed to her from Francis Krupka. Golterman opened the letter in defendant's presence and read the first few sentences, which indicated defendant and Krupka were involved in a homosexual relationship. Defendant grabbed the letter and ran to his apartment. Golterman followed and asked defendant to return the letter. When defendant refused, Golterman confronted him about his alleged relationship with Krupka. Golterman then attempted to grab the letter, but defendant pinned Golterman's arm behind her back. Golterman managed to break free and again asked about the alleged relationship. Defendant violently grabbed Golterman's throat for more than a minute, kicked her in the abdomen and pushed her to the apartment floor. Golterman then left defendant's apartment. The trial court granted the State's motion, finding such evidence admissible.

The evidence presented at trial established the following. On February 25, 1995, David Stoner, Francis Krupka and the victim, Molly, attended a party at defendant's Park West apartment. At about 8 p.m., Molly and Krupka had a conversation in the bedroom. Defendant and Stoner remained in the living room. While Molly and Krupka conversed, Mary White, Molly's best friend and neighbor of defendant, arrived. After briefly talking with defendant and Stoner, Mary went to the bedroom and noticed Molly was upset. Mary and Molly left the

party and walked to Mary's apartment. Molly told Mary about her conversation with Krupka and specifically recounted Krupka stated he was in love with defendant. Molly ultimately returned to defendant's apartment.

Sometime after Molly's return, defendant, Krupka and Molly were in the kitchen. Suddenly, defendant pushed Krupka against the wall. Molly intervened and questioned defendant about his conduct. Defendant released Krupka and returned to the couch in the living room. Krupka followed defendant and sat on the floor in front of defendant. When Molly saw how defendant and Krupka were sitting, she stated "This is sick. I'm going home." Molly gathered her belongings, and she and Stoner left the apartment at about 11 p.m. Stoner walked Molly to her vehicle and then drove home.

Louis Poppenhouse testified he was using the laundry facilities at Park West on February 26, 1995. At about 1:30 a.m. Poppenhouse heard two men, whom he described as intoxicated, arguing and shouting near the VFW building, which is located directly east of the Park West complex. Poppenhouse called the police after hearing several noises he described as "banging against a metal building." As he waited for the police, Poppenhouse heard one of the individuals yell "Motherfucker. Why did you do it? I'm going to kill you." Because of his location, Poppenhouse could not identify the individuals.

Robert Heaton, a police officer, responded to Poppenhouse's 911 call. When Heaton arrived, he noticed a white male near the VFW building. Upon seeing Heaton's vehicle, this individual immediately turned and entered the building in which defendant's apartment was located. Heaton described the man as approximately 5 feet 9 inches tall and weighing between 180 and 200 pounds. Defendant was then 5 feet 8 inches tall and weighed approximately 200 pounds. Heaton, along with fellow police officer Brad Sack, later discovered the body of a deceased white female lying in the VFW parking lot about 10 feet from the VFW building. The body was identified as Molly at about 1 p.m. that day.

Several individuals talked to defendant on the morning of February 26 concerning Molly's whereabouts. According to Molly's mother, Helen, defendant stated Molly left his apartment the night before and had not returned. She and defendant exchanged a series of telephone calls and, each time, defendant insisted Molly had to be with her friend Mary. In their last conversation, defendant said the body of a woman had been found in the parking lot but, given the description, the woman could not have been Molly. Defendant also told Mary White and her husband, David, he had no knowledge of Molly's whereabouts.

Mary Cullen and Julie Sullivan, sisters of the victim, went to

defendant's apartment sometime before 11 a.m. Defendant and Krupka were in the apartment. When Cullen and Julie asked defendant about Molly's whereabouts, defendant repeatedly replied the "fucking niggers" killed her. Cullen and Julie saw some of Molly's personal belongings lying around defendant's apartment, including her necklace, rings, shoes, and purse.

Springfield detectives Charles Cox and Doug Williamson also talked to defendant. They stated defendant appeared intoxicated and became irate and verbally abusive when questioned about Molly's whereabouts. According to the detectives, defendant repeatedly yelled at them to look for the "fucking niggers" who killed Molly and denied knowing her location.

Pursuant to a search warrant executed later that day, police seized various items of evidence from defendant's apartment, including Molly's belongings and clothing worn by defendant the previous evening. Defendant was sleeping when the warrant was executed, but awoke before the police left. After he awoke, defendant was informed the woman found in the parking lot was Molly. Defendant immediately turned to the officers and asked "Am I under arrest?" Cox asked defendant why he would be under arrest. Defendant again became belligerent and verbally abusive. The detectives suggested defendant come to the police station after he relaxed and then left the apartment.

The detectives interviewed defendant that evening at the police station, but were unable to obtain any information because defendant was still belligerent. They conducted a final interview on February 28, 1995, at the home of defendant's father. Defendant was then fully cooperative and maintained he did not know what happened to Molly.

After Golterman recounted the October 1993 incident, Drs. Joan Barrenfanger and Edmund Donoghue testified on the cause of Molly's death. Dr. Barrenfanger, a pathologist, explained the upper portion of Molly's right arm had been fractured. She concluded the fracture occurred before Molly's death and, after reviewing X rays with an orthopedic surgeon, determined the injury was characteristic of a fall. She also noted Molly had aspirated. While unable to determine the exact cause of death, Dr. Barrenfanger concluded within a reasonable degree of medical certainty Molly had died of asphyxiation.

On cross-examination, Dr. Barrenfanger explained the effects of Kugelberg-Welander disease, a form of muscular dystrophy that afflicted the upper portion of Molly's body. Molly's condition would have caused extreme weakness in her chest, arms and hands and the muscles around Molly's ribs and diaphragm would have been deteriorating, which, in her opinion, would have inhibited her ability to breathe.

Dr. Barrenfanger further described markings on Molly's upper body. She highlighted bruising, specifically an abrasion on the right side of Molly's neck. She concluded this abrasion could have been caused by Molly's necklace seized from defendant's apartment. She outlined several physical characteristics she would expect to find on a person who had died of strangulation, such as conjunctiva hemorrhages around the eyes, hemorrhaging around the muscles and bones of the neck, a break of the hyoid bone, and abnormalities around the trachea and larynx. Dr. Barrenfanger's examination of Molly failed to uncover any of these features. She stated no particular damage to the throat and the hyoid bone is visible in approximately two-thirds of all strangulation cases. Although acknowledging the mark on Molly's neck was consistent with the necklace, Dr. Barrenfanger stated, if Molly had been strangled with this item, she would have expected to find a longer abrasion as well as defense wounds. Dr. Barrenfanger found no evidence of defense wounds.

Dr. Barrenfanger also explained "compressional asphyxiation," which occurs when a person is unable to breathe properly due to continued compression of the rib cage. She stated, in light of Molly's muscular anomaly, the necessary weight to suffocate her would be less than required to suffocate an individual with a normal muscular structure. She said compressional asphyxiation could have been the cause of Molly's death, but conceded no evidence existed to support this finding.

Dr. Donoghue, a forensic pathologist from Cook County, Illinois, conducted a retrospective review of 25 strangulation cases to identify different types of injuries on the human body. He noted three distinct types of cases: (1) instances where only external injuries were present; (2) instances where only internal injuries were present; and (3) instances where both external and internal injuries were present. Upon reviewing Molly's autopsy materials, Dr. Donoghue testified within a reasonable degree of medical certainty Molly died of strangulation. The marks on Molly's neck were consistent with having been made by her necklace, and, in his opinion, were caused by the necklace being pressed against the neck when she was was strangled.

On cross-examination, Dr. Donoghue conceded he would have been better informed if he participated in the examination of Molly's body. He nonetheless stated any difference would have been inconsequential because the findings of Dr. Barrenfanger were sufficiently competent to make an accurate determination. He acknowledged, with the exception of the abrasion on the neck, the autopsy materials revealed no other indicia of strangulation. He disagreed with Dr. Barrenfanger's characterization of the neck abrasion as trivial because, in his opinion,

even small injuries to the neck can be significant. He concluded the abrasion in this case revealed the cause of death as strangulation.

Outside the presence of the jury, defendant called Krupka as a witness. Krupka was asked to describe his activities on the evening of February 25, 1995, and early morning hours of February 26. Krupka asserted his fifth amendment rights and declined to answer. Defense counsel asked the trial court to compel Krupka to testify claiming he had been granted immunity by the State. Defendant tendered a proffer of immunity executed by the State, Krupka and his attorney, and an order entered by Judge Leo Zappa purporting to grant Krupka immunity. The State maintained the order merely authorized a grant of immunity and, alternatively, any grant thereof had not been effectuated because Krupka failed to comply with the terms of its proffer. After hearing argument, the court determined Judge Zappa's order did not grant Krupka immunity and, in any event, any grant of immunity had not been effectuated. Defendant's request to compel Krupka's testimony was denied.

Defendant testified on his own behalf. He initially denied attacking Golterman in October 1993 and then described the events of February 25 and 26. He claimed Molly returned to his apartment after leaving with Stoner and they discussed the comments made by Krupka earlier that evening. At some point, Molly turned and began to walk away from defendant. Defendant attempted to grab Molly's shoulders as she turned but inadvertently grabbed the back of her necklace, causing it to break and fall to the floor. Defendant retrieved the necklace and tried to fix it at the living room table, while Molly stood directly behind him. Defendant continued the discussions and, in an effort to console Molly, turned to hug her. When he turned, they stumbled to the floor, causing defendant to fall on Molly's chest.

Defendant sat on Molly's chest as he continued to discuss the situation concerning Krupka. After three minutes, defendant observed no reaction from Molly and realized she was dead. Krupka telephoned a short time later and later arrived at the apartment. After arguing whether they should call the police or seek medical attention, they decided to drive Molly to the hospital. Defendant carried Molly's body to the VFW parking lot and placed her in the passenger seat of his vehicle. He believed Krupka would drive Molly to the hospital and claimed he saw Krupka drive his car out of the parking lot. Once Krupka left, defendant ran back to his apartment and passed out on the couch.

Defendant detailed several conversations with Molly's friends and family members the morning of February 26 and his later discussions with police. He acknowledged lying on each occasion about Molly's

whereabouts and the events of February 25 and 26. He explained he was untruthful because he panicked and was afraid nobody would believe him. Although defendant accepted responsibility for Molly's death, he stated he never intended to kill her and maintained her death was an accident.

Following his testimony, defendant again tried to call Krupka as a witness. The trial court, after argument, again denied defendant's request. The jury returned a verdict of guilty on all six counts.

## II. ANALYSIS

### A. Evidence of Defendant's Prior Misconduct

Defendant first contends the trial court erred in admitting Golterman's testimony on the October 1993 incident. He argues (1) this evidence was not relevant as to whether he murdered Molly and (2) any probative value was greatly outweighed by its prejudicial effect. The State maintains the evidence was relevant to prove criminal intent, lack of accident, and sobriety.

■ Generally, evidence of other crimes or wrongs is not admissible for the purpose of showing the defendant's disposition or propensity to commit such conduct. Such evidence is admissible when relevant to establish intent, motive, or absence of mistake or accident, or for any purpose other than to show a propensity to commit crime. *People v. Illgen*, 145 Ill. 2d 353, 364-65, 583 N.E.2d 515, 519 (1991). The admissibility of evidence at trial is a matter left to the sound discretion of the trial court, and this court will not overturn the trial court's decision absent a clear abuse of discretion. *People v. Harper*, 251 Ill. App. 3d 801, 804, 623 N.E.2d 775, 777 (1993).

■ We find Golterman's testimony was relevant. Defendant admitted causing Molly's death, but maintained it was accidental. The State refuted defendant's accident claim, arguing he strangled Molly after being confronted with allegations of a homosexual relationship with Krupka. Testimony of the October 1993 incident provided insight on defendant's reactions when confronted with allegations of homosexuality and was relevant to show defendant's state of mind at the time of Molly's death and refute any claim of accident. Defendant stresses one isolated abusive episode toward one person cannot be construed as an intent to injure another or be a valid basis for refuting a later claim of accident. Unlike instances where evidence of prior misconduct is introduced to show *modus operandi*, or that the crime was part of a common design or plan, the degree of identity between the two offenses is not necessary when such evidence is offered for some other purpose. When, as here, evidence of prior misconduct is offered to prove intent or the absence of accident, mere general areas of similarity will suffice. *Illgen*, 145 Ill. 2d at 373, 583 N.E.2d at 523.

Although the victims and end results differ, the circumstances surrounding the attack of Golterman and the death of Molly are strikingly similar. The differences between the two incidents do not eliminate the relevancy of Golterman's testimony. Moreover, given the charge to the jury to receive Golterman's testimony for the limited purpose of determining defendant's intent, knowledge, intoxication, and accident, the probative value of such evidence was not substantially outweighed by any prejudice to defendant. See *People v. Evans*, 125 Ill. 2d 50, 83, 530 N.E.2d 1360, 1374 (1988). Accordingly, we find no abuse of discretion.

### B. Krupka's Immunity

Defendant next contends he was denied a fair trial when the trial court refused to compel Krupka's testimony. Under the proffer, the State intended to grant Krupka use immunity under section 106—2.5(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/106—2.5(b) (West 1994)) in exchange for full cooperation in its investigation of Molly's death. The State intended to grant Krupka immunity on the condition he provided "complete and truthful information to law enforcement officials regarding criminal conduct and everything he knows or has reason to believe about the criminal conduct of others." In addition, Krupka was required "to produce any and all documents and physical evidence of any kind in his possession or under his control which relates to the information he provides." The State argues the grant of immunity was contingent upon Krupka's full cooperation with investigating authorities and expressly provided "the State [would] be relieved of its obligation[ ] [to grant immunity] should [Krupka] fail to be entirely candid and forthright in providing information."

■ Section 106—2.5(b) of the Code authorizes a court, upon motion of the State, to order "a witness be granted [use] immunity from prosecution in a criminal case as to any information directly or indirectly derived from the production of evidence from the witness if the witness has refused or is likely to refuse to produce the evidence on the basis of his or her privilege against self-incrimination." 725 ILCS 5/106—2.5(b) (West 1994). Use immunity granted under section 106—2.5 is different than a grant of transactional immunity found in sections 106—1 and 106—2 of the Code. Transactional immunity affords broader protection from future prosecution than use immunity and acts to completely bar the State from prosecuting an immunized witness for any offenses to which the immunity relates. On the other hand, a grant of use immunity does not act as an absolute bar from prosecution but, rather, prohibits the State from using any evidence

obtained under the grant of immunity, or leads derived from that evidence, against the immunized witness in a later criminal proceeding. *People ex rel. Cruz v. Fitzgerald*, 66 Ill. 2d 546, 549, 363 N.E.2d 835, 836-37 (1977).

■ We believe immunity was conferred upon Krupka by the agreement. The State suggests the order entered by Judge Zappa merely approved the process of granting immunity, but Krupka would have received immunity *only* if he complied with the terms of the agreement and cooperated with the police. It would appear Krupka, after receiving immunity, failed to cooperate or provide expected information. The State argues the immunity was never consummated because of this lack of cooperation. We disagree. On April 24, 1996, Judge Zappa entered an order that granted Krupka use immunity. Nothing further needed to occur. The State may not have received any benefit from the grant of immunity, but the law does not permit the State, in these circumstances, to withdraw the immunity because it is not satisfied with the level of cooperation of the witness.

Each prosecutor in each county of our state may have a different process for negotiating for a grant of immunity, striking an agreement, seeking an order of court and then deciding how to proceed. This case presents interesting questions on the best procedure to follow, but we need not address what constitutes the best practice. Here, Krupka was granted immunity and the defendant was entitled to call him as a witness. The trial court erred when it denied defendant's request to compel Krupka's testimony.

We also conclude this error does not require reversal. We note defense counsel did not know how Krupka would have responded to his questioning. Defense counsel advised the trial court he had not spoken with Krupka prior to trial. Defense counsel simply maintained Krupka's testimony would have been "of substantial value to the defendant." Defendant asserts in his brief Krupka's testimony would have substantially corroborated his version of events. Nothing in the record supports this contention. Defendant's own testimony indicated Krupka did not return to defendant's apartment until *after* Molly died. Whether Krupka's testimony would have been favorable to defendant's case is entirely speculative. Defendant does not know what Krupka would have said on the witness stand. Defendant was not denied a fair trial when he was not permitted to call Krupka as a witness.

### C. Prosecutorial Comments

■ Relying on *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), defendant contends he was denied a fair trial when

the State made improper references to his postarrest silence at trial. During its cross-examination of defendant, the State focused on the lies he told immediately after Molly's disappearance and his admission at trial he caused her death. The State further remarked in closing argument defendant carried his lies into the courtroom by obtaining the State's pretrial evidence to formulate his accident defense. According to defendant, the State's comments amounted to an attack on his constitutional right to remain silent. We disagree.

Under *Doyle*, the prosecution may not use an accused's postarrest silence to impeach an exculpatory story offered for the first time at trial. *Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244. Here, however, the State challenged defendant's credibility. The State highlighted defendant's numerous misstatements to both authorities and Molly's family members to raise the inference defendant's exculpatory claim was a mere fabrication. When read in context, the questions and remarks were references to the course of lying defendant undertook after the February 25 incident and not, as defendant contends, references to his right to remain silent.

## D. Sufficiency of Evidence

■ Defendant also contends the State failed to prove him guilty of murder beyond a reasonable doubt. When presented with a challenge to the sufficiency of the evidence, a reviewing court, considering the evidence in a light most favorable to the State, is limited to determining whether any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *People v. Oaks*, 169 Ill. 2d 409, 457-58, 662 N.E.2d 1328, 1349-50 (1996). A defendant's conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Gilliam*, 172 Ill. 2d 484, 515, 670 N.E.2d 606, 620 (1996).

■ To convict defendant of first degree murder, the State was required to prove beyond a reasonable doubt at least one of the following: defendant (1) intended to kill or do great bodily harm, (2) knew his acts would cause death or great bodily harm, (3) knew his acts created a strong probability of death or great bodily harm, or (4) was committing the offense of aggravated battery when Molly died. Defendant specifically contends the evidence fails to show he possessed the requisite state of mind in causing Molly's death. Mental states, such as the intent to kill or to cause great bodily harm, are not commonly established by direct evidence and may be inferred from the character of the defendant's conduct and the circumstances surrounding the commission of the offense. *People v. Summers*, 202 Ill. App. 3d 1, 10, 559 N.E.2d 1133, 1138 (1990).

■ Construing the evidence in a light most favorable to the State, we find the evidence sufficient to support defendant's murder conviction. Defendant's conduct preceding Molly's death, and his actions the following day, suggest he had the requisite criminal culpability. Defendant and Molly discussed the issue of defendant's homosexuality immediately before Molly's death. The record highlights defendant's violent temper when confronted with such accusations. Defendant acknowledged he knew something was wrong with Molly on the evening of February 25 yet did not seek medical treatment. Instead, he waited for Krupka to arrive at his apartment so they could discuss how to handle the situation. When later asked about Molly's whereabouts by authorities and several members of Molly's family, defendant lied, claiming he had not seen Molly since she left his apartment the night of February 25 and must be with friends at some other location. Defendant further maintained Molly was murdered by a group of unnamed individuals at a time when Molly's whereabouts were unknown and before the woman found in the parking lot had been identified. Upon being informed the woman had been identified as Molly, defendant immediately asked investigating officers if he was under arrest.

In addition, the physical evidence and medical testimony suggest Molly was strangled. Both pathologists described the bruising and abrasions on the right side of Molly's neck and concluded these markings were consistent with the necklace seized from defendant's apartment. Dr. Donoghue opined the markings resulted from pressure being applied on the necklace and concluded Molly's death was caused by strangulation. Although Dr. Barrenfanger was unable to determine the exact cause of Molly's death, she never eliminated the possibility of strangulation. Defendant stresses several of the attributes characteristic of strangulation were not present in Molly's case. However, according to Dr. Barrenfanger, no particular damage would be visible to the hyoid bone or other areas of the throat in approximately two-thirds of such cases. Moreover, Dr. Donoghue testified, in some cases, the victim would not sustain any internal injuries. Although Dr. Barrenfanger stated Molly could have died from compressional asphyxiation, neither she nor Dr. Donoghue found any evidence to support such a finding.

The jury was responsible for assessing the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. The determination of how Molly died rested with the jury, and it was not required to accept defendant's exculpatory claim that her death was an accident. See *Gilliam*, 172 Ill. 2d at 515-16, 670 N.E.2d at 621 (jury need not "accept any possible explana-

tion compatible with defendant's innocence and elevate it to the status of reasonable doubt"). Given the circumstances of Molly's death and the medical testimony, we conclude a rational trier of fact could have found defendant guilty of first degree murder beyond a reasonable doubt.

### E. Sentencing

■ Defendant finally argues the trial court erred in imposing sentence when it found "the *conduct here* caused serious harm." (Emphasis added.) We disagree. As evident by the above statement, the court considered the nature and manner of defendant's actions in causing Molly's death, and not the death itself, in fixing punishment. See *People v. Saldivar*, 113 Ill. 2d 256, 271, 497 N.E.2d 1138, 1144 (1986). Accordingly, we find no abuse of discretion in defendant's sentence. *Illgen*, 145 Ill. 2d at 379, 583 N.E.2d at 526.

### III. CONCLUSION

■ For the foregoing reasons, defendant's conviction and sentence for murder are affirmed. However, only the conviction on the most serious charge, count I, may stand. We therefore vacate the murder convictions on counts II, III, and IV (see 155 Ill. 2d R. 366(a)(5)) and remand the cause for issuance of an amended judgment of sentence showing the murder conviction is on count I.

Affirmed in part and vacated in part; cause remanded with directions.

STEIGMANN and GARMAN, JJ., concur.