# Illinois Official Reports

## Appellate Court

---

### *People v. Johnson*, 2018 IL App (1st) 140725

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBIN JOHNSON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-0725 |
| Filed<br>Rehearing denied | March 30, 2018<br>April 25, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-14022; the Hon. Thomas V. Gainer Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Christopher Kopacz, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Sheilah O'Grady-Krajniak, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Robin Johnson, was convicted in a jury trial of the first degree murder of Chicago police officer Richard Francis, disarming Officer Francis, and aggravated discharge of a firearm toward another Chicago police officer, for which she received sentences of, respectively, mandatory natural life, 4 years' imprisonment, and 15 years' imprisonment. In this appeal, defendant raises several challenges to the judgment. Defendant alleges that the trial court violated her constitutional right to present a defense when it barred proposed expert and lay testimony that she contends establishes that she was in a postictal, or post-seizure, state at the time of the offense. Defendant also argues that the trial court erred in refusing to instruct the jury on involuntary manslaughter and in not allowing defense counsel to impeach a defense witness about the State having provided the witness with housing prior to her testifying at trial. Finally, defendant contends that her mandatory natural life sentence is unconstitutional.[1]

¶ 2        The record shows that defendant was charged by indictment with four counts of first degree murder of a peace officer, eight counts of attempted murder, four counts of aggravated discharge of a firearm, and disarming a peace officer, arising from a July 2, 2008, incident that occurred after Officer Francis was called to investigate a disturbance on a Chicago Transit Authority (CTA) bus. Prior to trial, defendant submitted an answer to the State's motion for pretrial discovery that suggested that defendant would "rely on the State's inability to prove its case beyond a reasonable doubt." Defendant also indicated that she was contemplating asserting the affirmative defense of insanity.

¶ 3        On October 16, 2013, the day before jury selection was set to commence, defendant filed a motion to allow her "to present the defenses and supporting evidence that (1) she did not act intentionally or knowingly as required under the charged statutes and (2) she did not perform a voluntary act as required by the criminal code." The defense indicated that it "had investigated the possibility of presenting an insanity defense" and believed that the insanity defense would be "a weak and ineffective defense." However, counsel believed that defendant had "a strong defense" based on her "not possess[ing] the mental state necessary to commit first degree murder" and "not perform[ing] a voluntary act." Counsel further stated an intent to call Dr. Stephan Schuele to testify that defendant suffers from epileptic seizures and that she was "in a postictal or post-seizure state at the time that" the officer was shot. Dr. Schuele would further testify that defendant "was not capable of forming the necessary mental state to commit first degree murder" and that her medical condition "created a confused state such that [defendant] was not performing voluntary acts." Defendant also claimed that her condition, which resulted from "a seizure and postictal state, could lead a jury to conclude that she acted recklessly and therefore committed the offense of involuntary manslaughter rather than first degree murder."

¶ 4        On October 16, 2013, the State filed a motion *in limine* to exclude defendant's proposed expert testimony in the absence of an insanity defense. The State argued that where defendant was not presenting an insanity defense, the proposed testimony was irrelevant and amounted to

_____

[1]In defendant's initial brief, she also raised an issue regarding her mittimus, contending that she was credited for only 2044 days spent in custody prior to sentencing when she actually spent 2045 days in pre-sentencing custody. After the State responded that 2044 was the correct number of days, since the date of sentencing is not included in the calculation (see *People v. Williams*, 239 Ill. 2d 503, 509 (2011)), defendant withdrew that issue in her reply brief.

"an improper attempt to resurrect the now-defunct defense of diminished capacity." The State further asserted that "the proposed testimony on the issue of epilepsy, would serve only to confuse the jury and to invade the province of the jury."

¶ 5    On October 17, 2013, the court held a pretrial hearing for the court to hear Dr. Schuele's proposed testimony and consider its admissibility at trial. Dr. Schuele testified that he was a neurophysiologist and epileptologist at Northwestern University and Northwestern Medical Faculty Foundation (Foundation). Dr. Schuele further testified that he was "the section head for the Epilepsy Section" at the Foundation, and the Medical Director of the Neurological Testing Center at Northwestern Memorial Hospital. In 2010, Dr. Schuele was asked to evaluate defendant. In evaluating her, Dr. Schuele interviewed defendant and her family members and relied on a neuropsychological report prepared by Dr. Robert Hanlon, the fire department incident report, the police case report, the indictment, the video surveillance footage of the incident, and defendant's prior hospitalization records.

¶ 6    Dr. Schuele explained that epilepsy is "a tendency of the brain to have unprovoked, recurrent seizures, epileptic seizures" and that it was "basically defined as having had at least two unprovoked epileptic seizures." Dr. Schuele stated that a person could have epileptic seizures without having epilepsy when the seizures were "provoked." He stated that provoking factors could include a "variety of medical conditions," including renal failure, liver failure, and dehydration after, for example, running a marathon or substance abuse. Dr. Schuele testified that he did not diagnose defendant with epilepsy because he was not able to determine whether her seizures were provoked or unprovoked. He was "confident to say that she has epileptic seizures," but noted that defendant had certain risk factors for provoked seizures. Specifically, Dr. Schuele stated that if defendant had provoked seizures, they would have been caused by her chronic drug use, alcohol use, or alcohol withdrawal. Dr. Schuele also stated that he looked at defendant's EEG records, which were normal, but explained that about 20% of people with epilepsy will have normal EEGs.

¶ 7    Dr. Schuele further explained that a "postictal period" referred to "the fact that directly following a seizure most patients are confused for a certain period of time." This period normally lasts between 10 and 30 minutes; however, some patients with frequent seizures, or a cluster of seizures, "go into a prolonged confusional, delusional state." Dr. Schuele stated that this was "basically a prolongation of the acute postictal state," in which people are tired, confused, disoriented, and, in some cases, agitated or violent. Dr. Schuele described this as "postictal psychosis," where a person has "one or two or several days" where he or she exhibits "paranoid and delusional and bizarre behavior." Dr. Schuele testified that a person can "walk and *** function to a certain degree, but they *** have psychotic symptoms where they [have] irrational or erratic or bizarre behavior."

¶ 8    Dr. Schuele noted that defendant was hospitalized on June 29, 2008, three days before the incident, and that there was a handwritten note in the record that she had been "postictal" the day before and was "[n]ow feeling better." Dr. Schuele testified that, from defendant's history and the descriptions he had been given, he believed that it was "reasonable to assume that [defendant] was in a postictal state" on July 2, 2008, and that, at the time of the incident, defendant "showed signs of erratic behavior consistent with an acute confusional state."

¶ 9    The doctor also explained that the symptoms of a postictal period could "wax and wane" and that "people who are delirious or postictal have moments where they make clear statements and other moments where they make very incoherent or out of context statements."

He also stated that he could not "exclude that during these three days she would have the intention to go to the bathroom or she had the intention to eat something or do something intentional" but stated that the surveillance video of the incident gave him "information of how erratic she was at the moment of the incident." Dr. Schuele specifically characterized the video as showing that when defendant was on the bus, she engaged in a motion mimicking putting money in the fare box, when she did not actually do so, and that she was walking behind one of the bus passengers with her arms bent. Dr. Schuele also relied on reports that the bus passenger asked defendant why she was following her, and defendant responded, "[Y]ou made me this way."

¶ 10        Dr. Schuele further explained that a person

"in a delirious state has actions which are volitional and actions which are erratic. *** [W]e are not talking about a patient who is comatose and unresponsive and where things are black and white. We're talking about a situation where obviously every step a person does is a volitional act because, otherwise, we wouldn't walk. *** So, yes, obviously, she does many volitional things. She does—it is my opinion as well that she does many erratic things."

¶ 11        When asked whether Dr. Schuele could tell which parts of the sequence of events were volitional and which were erratic, the doctor responded:

"I think you can probably judge erratic behavior as good [sic] as I can. You know, it's erratic to mimic putting money in the fare thing. *** [I]t is erratic to walk behind someone with your arms bent and walking back and forth. *** It is erratic to answer questions of why do you follow me with, like, you made me this way. That is paranoid and delusional."

Dr. Schuele clarified, however, that when he used the words "paranoid and delusional," he was describing the postictal state, not making a psychiatric diagnosis, and that a doctor "obviously do[es]n't make a psychiatric diagnosis just because someone *** was confused after a seizure."

¶ 12        Dr. Schuele stated that it was his understanding that "movements are volitional" and that "holding something, pulling a trigger" and pointing a gun at someone, were "volitional act[s]." However, Dr. Schuele stated that he believed that defendant did not "understand[ ] the situation" and that she was "paranoid and *** fe[lt] threatened to an irrational degree."

¶ 13        When asked about whether he knew from witness accounts that Officer Francis did not get up or move after the initial gunshot, Dr. Schuele responded, "If I remember the video, the video, obviously, doesn't show much. The video on that part, there's a lot of obstruction." Dr. Schuele was also asked whether he recalled that defendant was "accused of hiding behind a car and shooting in the direction of other officers after she shot and killed Officer Franc[i]s," and responded that he "d[id]n't remember that detail."

¶ 14        At the conclusion of Dr. Schuele's testimony, the court indicated that it would have a ruling in the morning before jury selection.

¶ 15        The next morning, the court began by noting that, typically, "a defendant's state of mind is a question of fact to be determined by the jury" and that it "may be inferred from the character of the defendant's conduct and the circumstances surrounding the commission of the offense." The court continued:

"The admissibility of expert testimony regarding a defendant's intent or lack thereof which is the ultimate issue in a murder prosecution depends on whether the expert is to testify to facts requiring scientific knowledge not within the common knowledge of the jury.

    ***

Dr. Schuele's testimony in this case is not being offered in support of the affirmative defense of insanity. It's being offered only on the issue of her intent, and it comes under the rubric of a reasonable doubt argument. ***

But expert testimony cannot and must not confuse the jury or invade the province of the jury in determining the ultimate issues. ***

Dr. Schuele described what he called the postictal phase which occurs after the seizures. ***

In this state, the person could appear paranoid and delusional, but according to Dr. Schuele, would also be capable of performing voluntary acts such as pointing a gun at someone, shooting that person, hiding behind a vehicle, and firing a weapon at other police officers who arrived on the scene while protecting herself.

Dr. Schuele testified that there was no psychiatric or psychological diagnosis made that the defendant suffered from paranoia or delusional thinking[.]

    ***

Dr. Schuele testified that while she may have been confused and agitated as a result of her postictal state, she was capable of engaging in voluntary acts such as I have described, aiming a gun at a victim, shooting the victim, protecting herself, and then shooting at other police officers.

In this Court's opinion, this testimony would only serve to confuse the jury on the ultimate issue in the case since the doctor is saying two things. She's in this confused and agitated state, but she's also capable of engaging in volitional acts. To allow anger, agitation, confusion, erratic behavior which result in the defendant's long history of alcoholism and substance abuse to rise to the level of mental disease or defect would make voluntary intoxication a defense to criminal conduct, and Illinois does not recognize voluntary intoxication as a defense.

    ***

This testimony that's being offered is more akin to the diminished capacity defense ***.

    ***

Dr. Schuele's testimony that the defendant was in a postictal state of agitation and aggression but still capable of volitional acts would only confuse the jury on an issue which is theirs [*sic*] to decide."

¶ 16    After ruling, the State also indicated that it "would be objecting" to the defense presenting evidence through lay opinions given by family members and paramedics that defendant suffered from seizures. Defense counsel responded that the defense would not be asking about their opinions of whether defendant was suffering from a seizure, but that the defense should be able to call these witnesses to testify regarding the "facts of what they observed." The court ruled that defendant did not have a right to "ask them opinions about postictal states and such. But I believe you have a right to call witnesses to testify to her behavior."

¶ 17    On October 21, 2013, the State sought to clarify the trial court's ruling by filing a motion *in limine* seeking to prevent the defense from providing evidence of "defendant's medical and mental history as it is not relevant to any issue before the court." The State asserted that any evidence "of the defendant's mental health in the form of prior seizures, confusion, medication or current medical diagnoses are not relevant absent an insanity defense." The State argued that it was "obvious that the defense [wa]s trying to circumvent their burden" of proving insanity, and that the defense's "attempts to call her family, paramedics, and doctors" were only relevant to a nonexistent diminished capacity defense. The State asked that the evidence "be excluded as it remains irrelevant, in no way assists the jury and would instead serve to confuse the jury while deliberating the issues in the case." The State also explained that some of the evidence that defendant sought to admit constituted hearsay, was speculative, or was "too remote to be relevant."

¶ 18    In ruling on the State's motion *in limine*, the court explained that its prior ruling

> "was that the jury should be able to determine [the voluntariness of] the acts, all the acts of the defendant and her acts at the time she encountered the police officer, and no expert testimony was necessary ***.
>
> The evidence that this woman suffers from epilepsy, had suffered from epilepsy in the past and had involved herself in seizure-type behavior in the past is not relevant to the issue of whether or not she was committing a voluntary act on the night in question."

¶ 19    The court noted that Dr. Schuele testified that defendant was "capable of committing voluntary acts" and concluded that

> "all this epilepsy evidence is only going to confuse the jury. It's excludable under 403. It's really not relevant to what happened. ***
>
> This type of evidence, all of it, the daughters, the boyfriend, the paramedics, and the doctors, is going to mislead the jury. The jury is going to have to make up its mind from what it hears from the witnesses, *** and *** what they see in the video to determine whether or not she was acting volitionally.
>
> She does not have an affirmative defense, and there is no defense of diminished capacity under Illinois law."

¶ 20    The defense asked the court to reconsider, and the court stated, "I still believe that this is more in the nature of a diminished capacity defense which does not exist in Illinois, and my ruling is no one will testify concerning epilepsy."

¶ 21    After opening statements, the State called Debra Francis, widow of the deceased victim, Chicago police officer Richard Francis. Debra testified that she last saw her husband at 10:40 p.m. on July 1, 2008, before he left for his 11 p.m. shift. After 2 a.m., a police officer rang her doorbell and drove her to the hospital, where she learned that her husband had died.

¶ 22    Tracey Jackson testified that she was working the overnight shift as a CTA bus operator on July 1 and 2, 2008. Around 1:50 a.m. on July 2, 2008, Jackson stopped the bus at the intersection of Belmont, Western, and Clybourn Avenues, across the street from a police station, to let passengers on and off the bus. One passenger, a middle-aged Hispanic woman later identified as Donna Barney, exited the bus, and two people stepped onto the bus. Jackson identified defendant as the second person to step onto the bus, and testified that defendant turned around and stepped off of the bus a few seconds after Barney exited. Jackson saw

defendant follow Barney, walking "very closely, step for step behind" her. Barney then came back to the bus with defendant following, and Jackson unsuccessfully tried to separate the women by closing the doors between them. Barney exited the bus, and defendant again followed. At that point, Jackson requested assistance using a machine on the bus. Jackson saw a Chicago police car driving northwest on Clybourn, so she "beeped [her] horn and waved at" the driver. The officer, identified as Officer Francis, stopped the car and exited, and Jackson exited her bus to speak with him. Jackson then returned to the bus, and when she turned around again, she saw defendant and Officer Francis "in [a] struggle." Jackson saw "both of them start to fall to the ground," then saw a "flash" which she understood to be a gunshot. Jackson screamed and ran to the back of the bus. The State then published the surveillance footage from the CTA bus for the jury.

¶ 23   Jennifer Orze testified that on July 2, 2008, she was an office manager at Chicago Veterinary Emergency and Specialty Services on Clybourn, a 24-hour veterinary clinic near Belmont and Western. Around 1:53 a.m. on that date, Orze began driving home after the end of her shift. Orze drove north on Western, and was stopped at the traffic light at Belmont and Western when she noticed a police patrol car stopped in front of a bus at the corner. Orze was approximately 20 feet away from the patrol car when she saw Officer Francis attempting to escort defendant away from the bus and towards the squad car, with his hand on her arm. Orze saw that defendant was "jerking her arm away as [Officer Francis] was trying to hold onto her arm." Orze then saw that Officer Francis appeared to "los[e] control of [defendant's] arm for probably a second" and defendant and Officer Francis fell to the ground, with Officer Francis on top of defendant. A "couple of seconds" later, Officer Francis started to get up, and was on his knees with both hands on either side of his face with his palms open and nothing in his hands. Defendant was still on the ground, when Orze heard a gunshot and saw Officer Francis fall back. Orze noticed that other squad cars had arrived on the scene and heard officers commanding defendant to drop her weapon. Orze saw defendant, with a gun in her hand, pointing the gun toward the officers. Orze heard another gunshot, which sounded like it was coming towards her. Orze then drove away from the intersection and went back to her office, where she told her coworkers about what she had witnessed. At some point later, Orze saw officers on foot in the area, and she went outside her office to speak to the officers and let them know that she had witnessed the incident.

¶ 24   Robert Kalnes testified that he was working the overnight shift on July 1 to 2, 2008, as a dispatcher at the Illinois State Police. Kalnes received two calls that night from Officer Francis. At 1:53 a.m., Officer Francis called to state that he was stopping for a bus disturbance and, shortly thereafter, called again for assistance. The two calls were published for the jury.

¶ 25   The Chicago police officers who responded to the scene—Emmert Gauthier, Darrel Rizzo, Kevin Leahy, and William Seski—each testified. Officer Gauthier testified that on July 2, 2008, he and Officer Rizzo were on duty together, patrolling in a marked car, when they received a call to go to the intersection of Belmont and Western. Officer Rizzo drove the patrol car towards that intersection, with Officer Gauthier in the passenger seat. As they arrived, they saw Officer Francis's squad car parked in front of a bus that was parked at that intersection, just west of Western Avenue. Officer Gauthier testified that he saw Officer Francis escorting defendant to the back of his squad car when defendant pulled Officer Francis toward her and he fell forward. Officer Gauthier exited his vehicle to help, while Officer Rizzo parked the car. From two or three feet away, Officer Gauthier saw Officer Francis on the ground, and

defendant in front of Officer Francis in a crouched position with a silver revolver in her hands. Officer Francis started to step up into a standing position, with his hands on either side of his face and with his palms open and empty. Officer Gauthier heard a "pop," and saw Officer Francis's body fall back. Officer Gauthier yelled "she's got a gun" and ran to the back of Officer Francis's car to "take cover." Officer Gauthier heard several gunshots and saw that both defendant and other officers were shooting. Officer Gauthier saw other officers approaching defendant, who was on the ground, and Officer Seski kicked the gun out of her hand. Defendant tried to crawl under the car as the officers attempted to pull her out. Officer Leahy then moved Officer Francis's vehicle forward to expose defendant from underneath the car, and she was placed into custody.

¶ 26        Officer Rizzo testified that as he arrived at the scene, he saw Officer Francis escorting defendant from the bus. Officer Rizzo was looking for a place to park when he glanced back at the scene and saw defendant "fighting" and "trying to break away from" Officer Francis. Officer Rizzo then realized that it was "more of an emergency," so he parked in the intersection and exited the car to help. Officer Rizzo then heard shots and "became aware that we were under fire and that the fire was coming from the direction of the disturbance." Officer Rizzo hid behind the squad car and heard someone yell "she has a gun," which he understood to mean that defendant had a gun. Officer Rizzo saw defendant pointing a gun in his direction. At this point, Officer Rizzo saw that Officer Francis was on the ground and not moving. Defendant did not comply with the officers' commands to drop the gun, and Officer Rizzo ran around the car to a position where he felt that he had "a line of fire." Defendant would not drop the gun, and had it aimed at the officers, so Officer Rizzo fired three shots at defendant. Thereafter, Officer Rizzo saw defendant attempting to crawl underneath the squad car. Officer Rizzo unsuccessfully attempted to pull her out from underneath the car, but eventually, with the assistance of the other officers, he was able to secure and arrest defendant.

¶ 27        Officer Kevin Leahy testified that he and Officer Seski were on patrol in an unmarked car on July 2, 2008, when a call came in on the radio shortly before 2 a.m. from Officer Francis regarding a bus disturbance. Officer Leahy, who was driving, decided to turn the car around and go assist. As they approached, Officer Leahy immediately saw Officer Francis in a struggle. Before exiting the car, Officer Leahy heard a single gunshot. He exited the car, heard another gunshot and went towards the rear of the vehicle. Officer Leahy heard Officer Seski yell "she's got a gun, drop the gun, drop the gun," and saw defendant crouched, with a gun in her hand, pointing in his direction. Officer Leahy took cover for a "brief second," heard another shot, then saw that defendant was pointing the gun toward Officer Seski. Officer Leahy then fired five gunshots in defendant's direction. After those shots, Officer Leahy could no longer see defendant, so he ran around the front of his car, and saw defendant on the ground near the rear of Officer Francis's vehicle. Officers Leahy, Seski, and Rizzo ran up to defendant, who still had the gun in her hand. Officer Seski was able to kick the gun out of her hand, and defendant crawled underneath Officer Francis's car. The officers unsuccessfully attempted to pull her out from underneath the car. Officer Leahy then got in the vehicle and moved it forward approximately two feet until she was exposed, and the officers were able to handcuff her.

¶ 28        Officer Seski testified that around 1:53 a.m. on July 2, 2008, a call came in from Officer Francis that he had been flagged down for a bus disturbance at Belmont and Western Avenues. Officer Seski and Officer Leahy were approximately a half mile away from that location and

knew that Officer Francis was working alone, so they decided to go over to help. As they approached, Officer Seski saw Officer Francis engaged in a struggle with defendant. As Officer Seski began to open his door to exit the car, he heard a gunshot coming from the area of the struggle. Officer Seski ran towards the shot to assist Officer Francis and saw defendant raise her right hand over the trunk of Officer Francis's vehicle with a gun in her hand. Defendant pointed the gun at Officer Seski, who turned around and went back to the driver's side of Officer Rizzo's car for cover. Officer Seski saw defendant in a crouched position, holding the gun towards Officer Francis, and ordered her to drop the weapon. Defendant looked up and pointed the gun at Officers Seski and Rizzo. At that time, Officer Seski fired at the defendant eight times. Defendant "went down to the ground on her stomach" while still holding the gun. Officer Seski "saw an opportunity," so he ran towards defendant and kicked the gun out of her right hand. Defendant then began to crawl underneath the vehicle, and the officers were unable to apprehend her until Officer Leahy moved the car forward a few feet.

¶ 29    Expert testimony established that no suitable fingerprints were found on Officer Francis's revolver. The expert testimony also established that DNA samples were taken from the trigger and hand grips of Officer Francis's gun. The DNA profile taken from the trigger and hand grips matched defendant's DNA profile within a reasonable degree of scientific certainty. The probability that the DNA profile would occur was approximately 1 in 3.4 quadrillion African-American, 1 in 27 quadrillion Caucasian, and 1 in 560 quadrillion Hispanic unrelated individuals.

¶ 30    Robert Berk, a trace evidence analyst for the Illinois State Police, testified that he performed gunshot residue tests on both defendant's and Officer Francis's hands. He explained that a "positive finding" on a person's hand meant that the person has either "handled, discharged, or been in the vicinity of a firearm [when] it was discharged." In order to make a "positive finding," he needed to find three unique particles—lead, barium and antimony—present on the sample, as well as a significant number of "consistent particles."

¶ 31    If a sample had less than three unique particles, and not a significant number of consistent particles, then it would be a "negative sample," which meant that the person "may not have discharged a firearm, may not have been in the environment of a firearm when it was discharged, or may not have contacted an item that had primer gunshot residue on it." He also explained however, that a negative result could be caused if the particles were "removed by activity, or not deposited, or *** not detected by the procedure." Finally, if there were less than three unique particles, but a significant number of consistent particles, the result would be "inconclusive," which Berk stated indicated that a person "had discharged a firearm, [was] in the environment of a discharged firearm, *** contacted a primer gunshot residue related item, or *** received the particles from an environmental or occupational source."

¶ 32    Berk testified that he was able to indentify one unique particle on the samples taken from defendant's hands, but that there were a significant number of consistent particles present. Accordingly, the test results were inconclusive. The sample taken from Officer Francis's right hand tested negative, and the sample taken from his left hand was positive for the presence of primer gunshot residue. The parties stipulated that Officer Francis was right-handed.

¶ 33    John Flaskamp testified that he is a forensic scientist specializing in firearm and tool mark examination at the Illinois State Police. In relation to this case, Flaskamp received a revolver, three semi-automatic firearms, cartridge cases, and fired bullets. He determined that four bullets were fired from Officer Francis's gun. Flaskamp also testified that Officer Francis's

gun had two internal safeties—a "hammer block" and a "rebound slide"—both of which stopped the gun from firing when the trigger was not pulled. The two safety mechanisms would keep the gun from discharging accidentally, and the gun would not have gone off if dropped. The only way to fire the gun was to pull the trigger.

¶ 34    Dr. Joseph Cogan testified that he was a medical examiner for the Cook County Medical Examiner's office and that he performed an autopsy on Officer Francis's body on July 2, 2008. Dr. Cogan testified that Officer Francis had a gunshot wound to the left eye, with a group of lacerations around the entrance wound, indicating that he had been shot from close-range or about "18 inches or less" away. The trajectory of this wound was consistent with Officer Francis standing, and he had parallel abrasions on the rear of his head, indicating that his head hit something as he fell. Officer Francis had two other gunshot wounds, one that entered the abdomen and the other that went through the buttock. The gunshot which went through the buttock had an exit wound in the center of Officer Francis's back, with a large area of abrasion that was consistent with Officer Francis's body being against a hard surface, like a city sidewalk. Dr. Cogan also testified that he recovered a bullet that had evidence of flattening on one surface, which was consistent with Officer Francis lying on the ground at the time he was shot.

¶ 35    On October 23, 2013, before the defense presented its case, defendant filed a motion for reconsideration of the trial court's decision to bar testimony regarding defendant's seizures and included an offer of proof as to the proposed testimony. Defendant described the proposed testimony of defendant's daughters Kyra and Kaulea and defendant's boyfriend, Michael Biggs, who would testify regarding defendant's history of seizures. Kyra would testify that "during her periods of seizures," defendant would "become combative," not recognize her family members, and forget "her activities during the seizure and after seizures." Kyra would also testify that she saw defendant have three or four seizures on June 29, 2008, and that two days later, she and defendant got into a "verbal confrontation" during which defendant attempted to attack Kyra with knives from the kitchen before Biggs was able to take the knives away from defendant. Defendant left, and Kyra called the police.

¶ 36    Biggs would also testify that he saw defendant have four seizures on June 29, 2008, and that the next day he observed defendant "slurring her speech, speaking 'backwards,' " and referring to her grandchildren by the wrong names. On July 1, 2008, defendant was complaining of pain, and Biggs called 911. After talking to the responding paramedic, defendant's demeanor changed "for the worse." Defendant told Biggs to "go home," and Biggs "doubted that [she] knew who he was based on her behavior towards him" and her statements.

¶ 37    Defendant also indicated that the defense would call the Chicago police officers who responded to Kyra's 911 call on July 1, 2008, and paramedics who responded to calls and encountered defendant on June 29, 2008, and July 1, 2008. Defendant also stated that she intended to call various paramedics who responded to calls in 2004, 2005, and 2007, after defendant reportedly suffered other seizures. Finally, defendant attached the evaluation of Dr. Schuele, and testified that he would testify consistently with that evaluation. In the evaluation, Dr. Schuele stated that the "reason for referral" was to determine whether defendant "lacked substantial capacity to appreciate the criminality of her conduct due to a mental disease or defect." Dr. Schuele described the CTA surveillance video, and characterized defendant's behavior "in the four minutes before the shooting" as "odd, erratic, [and] 'magnetic' *** without a clear purpose of her action." The doctor stated that defendant "appear[ed to be] in an

acute psychotic state" and that she did not "seem to understand the actions around her or to be able to respond to them with any specific intention." Dr. Schuele thus concluded that defendant "at the time of the offense, lacked substantial capacity to appreciate the criminalityof [*sic*] her conduct due to a mental disease or defect."

¶ 38     On October 25, 2013, the court held a hearing on defendant's motion. The trial court noted that Dr. Schuele's report contained the "types of things we typically see in an insanity defense, but that's not the defense here." The trial court denied defendant's motion for reconsideration, finding that "all of this seizure testimony would only serve to confuse the jury." The court explained that if the "mental disease or defect *** would rise to the level of insanity, it certainly then would become relevant. But without being able to say anything specific, he'd only confuse the jury. *** Dr. Schuele maintain[ed] that she was capable of acting in a volitional way. It is for the jury to decide whether she knowingly and intentionally performed the acts which caused the death of Officer Francis." The trial court clarified that the ruling was regarding each and every witness, and that a number of the proposed witnesses were also "too remote in time" when they would be testifying regarding events from years prior to the incident.

¶ 39     Also outside the presence of the jury, the court held a hearing on the admissibility of the testimony of Deputy Laura Mlinarcik, who had been assisting in the courtroom during jury selection, opening statements, and the beginning of testimony. During the lunch break after Debra Francis's testimony, Deputy Mlinarcik heard defendant's conversation with another inmate, who asked defendant what she was in for. Defendant told the other inmate, "a police murder," to which the other inmate stated, "I f*** hate cops," and defendant replied, "I'd do it again." The trial court found that the State could not introduce the conversation in their case in chief but reserved ruling on whether the deputy could testify in rebuttal should defendant testify.

¶ 40     The defense called Dr. Rebecca Rico, who was working at Illinois Masonic Medical Center on July 2, 2008, when defendant arrived around 5:30 a.m. with multiple gunshot wounds.

¶ 41     Shawn Both testified that he was a paramedic with the Chicago Fire Department and that he arrived at the scene at Belmont and Western in the early morning hours of July 2, 2008. When he arrived, Both found defendant laying in the street with handcuffs on and covered in blood. He asked her how she was doing and defendant looked at him and spit blood at him. Defendant became physically combative, "kicking and being uncooperative," as Both and other responders attempted to secure her to a board in order to safely transport her to the hospital.

¶ 42     Sandra Figueroa, a dispatcher for the American United Cab Company, testified that she was working the overnight shift July 1 and 2, 2008 in an office at the intersection of Belmont and Western. Around 1:30 a.m., Figueroa looked out of a window onto Belmont and saw defendant stomping her feet and waving her hands in the air. Figueroa testified that defendant was saying something, but she could not hear what it was. Figueroa then went back to her desk to continue taking calls, and around 20 minutes later, she heard the sound of gunshots.

¶ 43     Victoria Pruszewski also testified that she worked for American United Cab Company and that around 9:45 or 10 p.m. on July 1, 2008, as she was getting off the bus to go to work, she saw defendant walking around and looking lost. After she got to work, Pruszewski saw defendant more than five times while she was looking out the window. Pruszewski described defendant as still walking around and looking lost on those occasions.

¶ 44    The parties stipulated that when defendant arrived at the hospital after the incident, her blood and urine were collected and sent to the toxicology lab. Defendant's blood tested negative for the presence of alcohol and her urine tested negative for the presence of amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolites, opiates, phencyclidine, and methadone.

¶ 45    Prior to the defense calling their next witness, Donna Barney, the State informed the court that it had previously learned that Barney was going to become homeless and without a permanent address. Defense counsel had requested that the State make Barney available, and in order to "facilitate her being available to both sides," the State put Barney in a hotel. The State argued that it did not believe that defense counsel was "intending to go into that," but such information would be "misleading to the jury because the only reason [the State] did that [wa]s to make her available to both sides." Defense counsel denied requesting that the State make Barney available by providing her a hotel, and responded that the defense should be able to impeach Barney, if necessary, with the fact that the State had been paying for her housing. Defense counsel asserted that such information was relevant to her "bias, interest and motive." The trial court stated that it would not allow the defense to introduce such evidence as impeachment because it should not "suggest *** that she is deriving some benefit from the State of Illinois in exchange for testimony that the State isn't even offering."

¶ 46    The defense then called Barney, who testified that on July 2, 2008, shortly before 2 a.m., she was riding a CTA bus headed eastbound on Belmont. Barney got off the bus at Belmont and Western Avenues to use the restroom at a gas station at that intersection. When Barney started to cross Western, she felt pressing on the back of her body. She turned around and saw defendant trying to get behind her. Defendant and Barney kept moving around each other, and defendant held her own breast with one hand and said, "You made me this way." Barney turned around and went back to speak with the bus driver, and both Barney and the bus driver said that they were going to call the police. When Officer Francis pulled up, Barney told him that defendant would not leave her alone. She asked Officer Francis if she could leave to use the restroom and then come back, and the officer told her not to "worry about it," and that she did not need to return. Barney started to walk away towards the gas station, then heard a "scuffling" behind her. She looked back at the scuffle for a second, but Barney testified that she could not recall the exact details of what was happening at the time of her testimony. Barney acknowledged that she told the detective on the scene that she saw Officer Francis appear to place defendant in a headlock with his arm, but she stated that at the time of her current testimony she could not remember seeing the headlock. She agreed that if it was in the detective's notes, she had said it, but explained that she was "not trying to be difficult, but I'm not remembering the specific headlock right now." Barney saw a number of police cars approaching, then heard a gunshot. Barney turned around and saw defendant with a gun in her hand and Officer Francis falling to the ground. Barney then heard more gunshots, and she crouched behind an unmarked squad car to avoid the gunshots. At some point, defendant looked at Barney "in the eye," and defendant pointed the gun in the direction of Barney and the responding police officers.

¶ 47    The defense next called Detective Heerdt, who testified that he was the primary detective assigned to the case. After the incident at approximately 3 a.m., Detective Heerdt spoke to Barney, who told him that "Officer Francis appeared to place [defendant] in a headlock with his arm."

¶ 48    After Detective Heerdt's testimony, defendant informed the court that she did not wish to testify on her own behalf and that she had discussed with her counsel, and agreed with, the decision not to pursue the affirmative defense of insanity.

¶ 49    The parties proceeded to the jury instruction conference at which defense counsel requested instructions on involuntary manslaughter. The trial court denied defense counsel's request, stating "I don't believe there's any evidence that would warrant the giving of a[n] involuntary manslaughter instruction because I don't believe that there is one of the four physical or one of the four qualifying factors." The trial court also found that "after reviewing all of the evidence *** there are no actions that one would deem reckless based on the testimony that I have heard from any witness. I'm not going to give an involuntary manslaughter instruction."

¶ 50    After closing arguments and deliberation, the jury found defendant guilty of the first degree murder and disarming of Officer Francis, and the aggravated discharge of a firearm towards Officer Rizzo. It acquitted defendant of the remaining attempted murder and aggravated discharge counts. Defendant's motion for a new trial was denied.

¶ 51    At sentencing, Debra Francis read a victim impact statement, describing the effect of her husband's murder on her and their two daughters. The State also submitted the incident report from Deputy Mlinarick regarding the conversation that she overheard in which defendant told another inmate that she was incarcerated for "killing a cop" and that she would "do it again." In mitigation, the defense noted that defendant had no prior criminal convictions. The defense also introduced medical records, which indicated that defendant had expressed remorse or sadness for what occurred on four occasions.

¶ 52    Defendant spoke in allocution, stating that she did not remember what happened during the incident and that after her daughter told her that she had killed a police officer, defendant said that she "d[id]n't like police officers, but [she] d[id]n't go around killing *** them."

¶ 53    In imposing sentence, the trial court noted that, while defendant was not under the influence of alcohol or drugs at the time of her arrest, her boyfriend had stated that "they had binged" a few days before the incident. The trial court also stated that defendant's stated remorse was "certainly offset by what was heard by the deputy in the lockup" and by defendant's statement at sentencing that she did not like the police.

¶ 54    Although the only sentence available for defendant's murder conviction was natural life, the trial court stated that defendant "earned that sentence" and that her "actions warrant[ed] that sentence." The trial court sentenced defendant to natural life without parole for the first degree murder of Officer Francis, 15 years' imprisonment for aggravated discharge of a firearm, to be served consecutively to the natural life sentence, and 4 years' imprisonment for disarming a police officer, to be served concurrently with her sentence for aggravated discharge. Defendant's motion to reconsider that sentence was denied, and defendant filed a timely notice of appeal.

¶ 55    In this court, defendant raises a number of challenges to the judgment. First, defendant contends that the trial court violated her constitutional right to present a defense when it barred the proposed expert and lay testimony regarding her seizures and that she was in a "postictal" state at the time of the offense. Defendant also argues that the trial court erred in refusing to instruct the jury on involuntary manslaughter and in not allowing defense counsel to impeach Barney about the State having provided for her housing. Finally, defendant contends that her mandatory natural life sentence is unconstitutional. We will address each issue in turn.

¶ 56    Defendant first contends that her constitutional right to present a defense was violated when the trial court precluded her from presenting evidence of her medical condition, including expert and lay testimony. Defendant contends that the excluded evidence was necessary to show that she was not acting voluntarily at the time of the shooting and that she lacked the requisite mental state for first degree murder and the other charged offenses. The State disagrees, contending that the trial court's exclusion of the proposed evidence was proper where the evidence was being offered to prove defendant's "diminished capacity," a defense which does not exist in Illinois.

¶ 57    As an initial matter, the parties disagree as to the appropriate standard of review pertaining to this issue. The State contends that it is within a trial court's discretion to determine the admissibility of evidence and we should review the trial court's decision to exclude the proposed evidence for an abuse of discretion. Defendant acknowledges that the decision to grant or deny a motion *in limine* generally will not be reversed absent an abuse of discretion, but argues that the question of whether her constitutional right to present a defense is violated is a purely legal issue that should be reviewed *de novo*.

¶ 58    A criminal defendant has a right to a meaningful opportunity to present a complete defense. *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006). Although the United States Constitution prohibits the exclusion of defense evidence under rules "that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by other factors, such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *Id.* at 326. A trial court has the inherent authority to admit or exclude evidence, and we review a trial court's decision to grant or deny a motion *in limine* pursuant to an abuse of discretion standard. *People v. Williams*, 188 Ill. 2d 365, 369 (1999); *People v. Garcia*, 2012 IL App (2d) 100656, ¶ 17. In particular, "[d]ecisions of whether to admit expert testimony are reviewed using this same abuse of discretion standard." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). Accordingly, because defendant's argument is really a challenge to the trial court's exclusion of the proposed evidence, we will review that decision for an abuse of discretion.

¶ 59    Abuse of discretion is the most deferential standard of review known to the law. *People v. Crane*, 195 Ill. 2d 42, 50 (2001). A trial court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the trial court's view. *Garcia*, 2012 IL App (2d) 100656, ¶ 17. A reviewing court does not consider whether it would have made the same decision if placed in the position of the trial court; rather, a reviewing court considers whether the decision of the trial court was arbitrary, made without conscientious judgment, or otherwise made in such a way that, " 'in view of all of the circumstances, the [trial] court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted.' " *People v. Burtron*, 376 Ill. App. 3d 856, 863 (2007); see also *People v. Donoho*, 204 Ill. 2d 159, 186 (2003) (" '[R]easonable minds [can] differ' about whether such evidence is admissible without requiring reversal under the abuse of discretion standard."). The use of the abuse of discretion standard in matters relating to the admissibility of evidence recognizes that a reviewing court owes some deference to the trial court's ability to evaluate the impact of the evidence on the jury. *People v. Illgen*, 145 Ill. 2d 353, 375-76 (1991).

¶ 60    Defendant contends that the court erred in barring the expert testimony of Dr. Schuele regarding his opinion that defendant was in a postictal period at the time of the offense and the

lay testimony of defendant's boyfriend, family members, and paramedics who interacted with defendant on previous occasions, all of whom would have corroborated defendant's "history of epileptic seizures and prolonged postictal states, as well as her condition in the days before the shooting incident." She contends that such evidence was relevant to the determination as to whether she acted voluntarily and her mental state. The State responds that the trial court properly excluded the proposed evidence because defendant was essentially attempting to raise the nonexistent defense of diminished capacity.

¶ 61    Defendant's main contention on appeal is that the proposed evidence would have demonstrated that her actions were not voluntary. A material element of every offense is a voluntary act (720 ILCS 5/4-1 (West 2008)), and it is a fundamental principle that a person is not criminally responsible for an involuntary act. *People v. Grant*, 71 Ill. 2d 551, 558 (1978). "A cornerstone of the defense of involuntary conduct is that a person, in a state of automatism, who lacks the volition to control or prevent his conduct, cannot be criminally responsible for such involuntary acts." *Id.* "Such involuntary acts may include those committed during convulsions, sleep, unconsciousness, hypnosis or seizures." *Id.* Here, however, there is no question that defendant was not in the throes of a seizure. Instead, she claimed to have been in a "postictal" state, during which she "wax[ed] and wane[d]" between volitional and "erratic" behavior, according to her proposed expert.

¶ 62    We ultimately agree with the State that the evidence was properly excluded because it amounted to a diminished capacity defense.

¶ 63    Diminished capacity is an affirmative defense that permits a "legally sane defendant to present evidence of mental illness to negate the specific intent required to commit a particular crime." *Metrish v. Lancaster*, 569 U.S. 351 (2013); see also Black's Law Dictionary 199 (7th ed. 1999) (defining "diminished capacity" as, "An impaired mental condition—short of insanity—that is caused by intoxication, trauma, or disease and that prevents the person from having the mental state necessary to be held responsible for a crime."). This defense is recognized in some jurisdictions around the country; however, some jurisdictions, including Illinois, have chosen to reject it. See *People v. Hulitt*, 361 Ill. App. 3d 634, 636 (2005); *Clark v. Arizona*, 548 U.S. 735, 770-79 (2006) (holding that Arizona's rule precluding the use of diminished capacity evidence to negate the *mens rea* element in the absence of an insanity defense did not violate due process).

¶ 64    As we discussed in *Hulitt*, 361 Ill. App. 3d at 640-41:

> "The doctrine of diminished capacity, also known as the doctrine of diminished or partial responsibility, allows a defendant to offer evidence of her mental condition in relation to her capacity to form the *mens rea* or intent required for commission of the charged offense. [Citation.] Similar to the insanity defense in that it calls into question the mental abnormality of a defendant, it differs in that it may be raised by a defendant who is legally sane."

¶ 65    We find this case analogous to *Hulitt*, in which this court affirmed the trial court's determination to exclude evidence that the trial and appellate courts found amounted to raising a diminished capacity defense. Specifically, in *Hulitt*, the defendant was charged with first degree murder of her two-year-old daughter. Prior to trial, the defendant claimed that she did not intend to raise an insanity defense, but instead wanted to raise a "reasonable doubt defense" through the expert testimony of a psychologist showing that she suffered from postpartum depression which left her "unable to appreciate the danger of her actions toward [her

daughter]." *Id.* at 636. The State filed a motion *in limine* barring testimony from the psychologist as to the defendant's mental capacity, and the trial court granted that motion. *Id.* at 636-37. The trial court found that the defendant was attempting to raise a diminished capacity defense, which did not exist in Illinois. *Id.* at 636. On appeal, the defendant argued that she was not attempting to claim diminished capacity; instead, she was attempting to show that she did not have the requisite intent to commit first degree murder.

¶ 66 This court affirmed the trial court's decision, concluding that "[d]efendant could not raise [diminished capacity] as an affirmative defense and, therefore, should not be permitted to raise it in the guise of a reasonable doubt argument." *Id.* at 641. We explained that the doctrine of diminished capacity allowed a defendant to offer evidence of a mental condition in relation to the defendant's capacity to form the intent required for commission of the charged offense. *Id.* at 640. We described the defense as follows:

"Diminished capacity is considered a partial defense because it is not presented as an excuse or justification for a crime but, rather, as an attempt to prove that the defendant, because she was incapable of forming the requisite intent of the crime charged, is innocent of that crime but likely guilty of a lesser included offense." *Id.* at 641.

¶ 67 Despite defendant's claims to the contrary, we find that, like in *Hulitt*, defendant's proposed evidence goes to the defense of diminished capacity, which does not exist in Illinois. *Id.*

¶ 68 Specifically with respect to the proposed expert testimony of Dr. Schuele, we find that the court did not abuse its discretion in choosing to exclude it. Our courts have held that the defendant's mental state is a question of fact to be determined by the trier of fact. *Id.* at 637. Mental states " ' "are not commonly established by direct evidence and may be inferred from the character of the defendant's conduct and the circumstances surrounding the commission of the offense." ' " *Id.* (quoting *People v. Raines*, 354 Ill. App. 3d 209, 220 (2004), quoting *People v. Adams*, 308 Ill. App. 3d 995, 1006 (1999)).

¶ 69 When deciding whether to admit expert testimony, the trial court should balance the probative value of the testimony against its prejudicial effect and should "carefully consider the necessity and relevance of the expert testimony in light of the particular facts of the case before admitting that testimony for the jury's consideration." *People v. Lerma*, 2016 IL 118496, ¶ 23. Relevant and probative testimony should be admitted, whereas misleading or confusing testimony should not be admitted. *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 78 (citing *People v. Tisdel*, 338 Ill. App. 3d 465, 468 (2003)). Moreover, expert testimony is only necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion, and expert testimony addressing matters of common knowledge is not admissible unless the subject is difficult to understand and explain. *Lerma*, 2016 IL 118496, ¶ 23.

¶ 70 In the absence of an insanity defense, we agree with the trial court that the proposed evidence would be irrelevant and serve only to confuse the jury. An expert may not give an opinion supporting the doctrine of diminished mental capacity because, as we have previously stated, that doctrine is not recognized in Illinois. See *Hulitt*, 361 Ill. App. 3d at 641. From our reading of the record, it is apparent that defendant was attempting to circumvent the requirements of pleading and proving an insanity defense, by instead claiming that her bizarre behavior was indicative of her lacking the mental state necessary for first degree murder. In

fact, the language used in Dr. Schuele's evaluation was specifically tailored to an insanity defense, concluding that defendant "at the time of the offense, lacked substantial capacity to appreciate the criminality *** of her conduct due to a mental disease or defect." See 720 ILCS 5/6-2 (West 2008). Defendant, however, ultimately chose not to pursue that defense.

¶ 71    Examining the testimony of Dr. Schuele, we note several statements that would have confused and misled the jury, specifically regarding his opinion of the voluntariness of defendant's actions. In particular, Dr. Schuele testified that, in his opinion, at the time of the offense, defendant was in a post-seizure state where she "showed signs of erratic behavior." He also believed that defendant was not "in complete understanding of the situation," and that she "fe[lt] threatened to an irrational degree," describing her behavior as "paranoid and delusional." Dr. Schuele, however, was not a psychiatrist, and explicitly stated that he was not making a psychiatric diagnosis. At no time during his testimony did Dr. Schuele state that defendant's actions in shooting Officer Francis were involuntary. He testified that she was behaving "erratic[ly]" and "irrational[ly]"; however, erratic or irrational behavior does not absolve defendant of responsibility for her actions. Dr. Schuele testified that a person is capable of engaging in volitional actions while in the postictal state, and specifically described the key actions in this case—holding and pointing a gun, and pulling the trigger—as "volitional act[s]."

¶ 72    Dr. Schuele also never testified as to when defendant allegedly suffered the seizure that left her in a postictal state at the time of the offense. There is no evidence that defendant had a seizure on the day of the incident. There is some suggestion that defendant may have had a seizure on June 28, 2008, or before, based on the handwritten note in her medical record from June 29, 2008, that she had been "postictal" the day before and was "[n]ow feeling better."

¶ 73    The significance of Dr. Schuele's testimony is also questionable because his testimony showed that his opinions were not based on a full and accurate understanding of the relevant events. First, Dr. Schuele acknowledged that he viewed an incomplete surveillance video of the incident, which did not include a full account of the events. Dr. Schuele also conceded that he did not view Officer Francis's autopsy report and testified that he did not recall that after shooting Officer Francis three times, defendant hid behind a car and shot in the direction of the responding officers.

¶ 74    Dr. Schuele also indicated during this testimony that the determination of whether an action is volitional or erratic was something that another person could "probably judge *** as [well] as" he could, describing certain actions that defendant engaged in prior to her encounter with Officer Francis as erratic. Because Dr. Schuele admitted that defendant was capable of both volitional and "erratic" acts while in a postictal state, and he effectively conceded that expert testimony would not be needed to determine which of defendant's acts were volitional, Dr. Schuele's proposed testimony was, admittedly, no longer in the realm where an expert opinion is needed. See *Becker*, 239 Ill. 2d at 235 ("A trial court does not err in barring expert testimony where the matter at issue is not beyond the ken of the average juror."); *Lerma*, 2016 IL 118496, ¶ 23; *Hulitt*, 361 Ill. App. 3d at 638 (2005) ("The admissibility of psychiatric evidence regarding a defendant's intent or lack thereof, the ultimate issue in a murder prosecution, depends on whether the expert is to testify to facts requiring scientific knowledge not within the common knowledge of the jury." (Internal quotation marks omitted)).

¶ 75    Additionally, Dr. Schuele's opinion about defendant's behavior was based in large part on his observations of the surveillance video, specifically observing that she "mimic[ked]"

putting money into the fare box and that she had her arms bent as she was following Barney. Having observed the surveillance video, we conclude that it would be difficult for Dr. Schuele to draw such conclusions from its viewing. The video is grainy and unclear, with much of the action—particularly that occurring outside the bus—obstructed from view. In particular, this court cannot determine whether defendant was "mimic[king]" putting money in the fare box. We would also find it to be quite a leap to conclude that defendant's later actions were involuntary because defendant had her arms crossed and made a confusing remark to a bus passenger, and Dr. Schuele provided no support for such a conclusion. See *People v. Mitchell*, 2011 IL App (1st) 083143, ¶ 80 ("An expert's opinion is only as valid as the basis and reasons for the opinion. [Citation.] A party must lay a foundation sufficient to establish the reliability of the bases for the expert's opinion." (Internal quotation marks omitted)).

¶ 76    For all of the above reasons, we find no abuse of discretion by the trial court in excluding the proposed testimony of Dr. Schuele.

¶ 77    In support of her contention that the proposed evidence would show that her actions were involuntary, defendant cites a number of cases, including *People v. Chmilenko*, 14 Ill. App. 3d 270 (1973), *People v. Nelson*, 2013 IL App (3d) 120191, and *People v. Martino*, 2012 IL App (2d) 101244.

¶ 78    The defendant in *Chmilenko* was a prisoner who was convicted of escaping from custody. The parties stipulated that the defendant suffered from epilepsy, consisting of " 'periods when the [defendant] continues to function physically and can walk and talk, but during which the [defendant] lacks conscious awareness of what he is doing, lacks conscious intent to do what he does, and lacks any recollection of what he did during the seizure.' " *Chmilenko*, 14 Ill. App. 3d at 272. On appeal, the appellate court noted that unrebutted testimony at trial established that the defendant suffered a seizure as he was being loaded into a transport from a police station and that the police did not notice that the defendant had collapsed to the ground and loaded the other prisoners in the transport, leaving the defendant behind. *Id.* at 271-72. No evidence showed that the defendant had the intent to escape, but the testimony was that he had a seizure, woke up, did not know where he was, and went to his home. *Id.* at 272. The appellate court reversed the defendant's conviction, finding the evidence that defendant had a seizure tended to raise doubt as to his ability to form the specific intent required by the statute because during a seizure, " 'the subject lacks conscious awareness of what he is doing, lacks conscious intent to do what he does.' " *Id.*

¶ 79    Here, however, defendant was not in the midst of a seizure when she shot Officer Francis, which could have rendered her actions completely involuntary like the actions at issue in *Chmilenko*. Instead, the proposed evidence sought to show that she was in the postictal period after a seizure, during which Dr. Schuele testified that she could engage in both volitional and erratic behavior. As stated above, Dr. Schuele did not testify that defendant's actions were involuntary; instead, he testified that she was capable of engaging in volitional acts and, specifically, that pointing a gun and pulling the trigger are volitional acts.

¶ 80    The other cases that defendant relies on, *Nelson*, 2013 IL App (3d) 120191, and *Martino*, 2012 IL App (2d) 101244, fare no better. In *Nelson*, the Third District Appellate Court reversed the defendant's conviction for telephone harassment because the "uncontroverted" expert testimony at trial regarding the defendant's Tourette syndrome showed that the defendant acted pursuant to an "involuntary tic" and did not intend to dial the phone. *Nelson*, 2013 IL App (3d) 120191, ¶ 29. In *Martino*, the Second District Appellate Court reversed the

defendant's conviction for aggravated domestic battery, where the police tased the defendant, and he fell onto his wife, breaking her arm. Because the defendant was "incapable of controlling his muscles" as a result of being tased, "his act of falling on [his wife] and breaking her arm was an involuntary act for which he cannot be held accountable." *Martino*, 2012 IL App (2d) 101244, ¶ 15. Unlike in these cases, there was no evidence that defendant was acting "pursuant to an involuntary tic" or was "incapable of controlling h[er] muscles."

¶ 81    For many of the same reasons, we also conclude that the trial court did not abuse its discretion in excluding the proposed lay witness testimony from defendant's family members, boyfriend, and medical personnel who interacted with defendant on prior occasions. Like Dr. Schuele's testimony, the proposed lay witness testimony was, at best, relevant to a diminished capacity defense. Additionally, none of the proposed lay witnesses were present at the scene of the offense, and each could testify only to having interacted with defendant several hours to four years prior to the incident. The testimony could have established, at most, that defendant had prior periods where she behaved "erratic[ally]" following seizures, but it would not have shown that she did not act voluntarily when she shot Officer Francis. Accordingly, we cannot say that the trial court's ruling on the State's motion *in limine* was arbitrary, fanciful, or unreasonable, and we find no abuse of discretion in excluding the proposed evidence.

¶ 82    Defendant next contends that the trial court erred in refusing to instruct the jury on involuntary manslaughter. Defendant, citing *People v. Consago*, 170 Ill. App. 3d 982, 986 (1988), argues that the evidence supported that the jury could have found her actions merely reckless based on the trial evidence because "the defendant's discharge of a weapon during a struggle is a well established form of reckless conduct."

¶ 83    The parties disagree on the applicable standard of review for this issue as well. Defendant cites *People v. Washington*, 2012 IL 110283, ¶ 19, to contend that the determination of whether sufficient evidence exists to support the giving of a jury instruction is a question of law subject to *de novo* review. However, as the State points out, our supreme court has since clarified that holding, limiting it to the facts of that case, which "reviewed a question of law: whether a second degree murder instruction must be given as a mandatory counterpart to an instruction on self-defense." *People v. McDonald*, 2016 IL 118882, ¶ 41. The supreme court then went on to hold that "when the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *Id.* ¶ 42. Accordingly, we review this issue for an abuse of discretion.

¶ 84    "The offenses of involuntary manslaughter and first degree murder require different mental states, such that involuntary manslaughter requires a less culpable mental state than first degree murder." *People v. Jones*, 219 Ill. 2d 1, 31 (2006). A defendant commits first degree murder when "he kills an individual without lawful justification and he knows that his acts create a strong probability of death or great bodily harm," whereas a defendant commits involuntary manslaughter when he "performs acts that are likely to cause death or great bodily harm to another and he performs these acts recklessly." *People v. DiVincenzo*, 183 Ill. 2d 239, 249-50 (1998) (citing 720 ILCS 5/9-1(a)(2), 9-3(a) (West 1994)). Recklessness is defined in section 4-6 of the Criminal Code of 1961 as follows:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from

- 19 -

the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2008).

¶ 85　　In general, an instruction on a lesser offense is justified "where there is some evidence to support the giving of the instruction." *DiVincenzo*, 183 Ill. 2d at 249 (citing *People v. Jones*, 175 Ill. 2d 126, 132 (1997)). Specifically, an involuntary manslaughter instruction should be given if there is some credible evidence in the record that would reduce the crime of first degree murder to involuntary manslaughter. *Id.* (citing *People v. Foster*, 119 Ill. 2d 69, 87 (1987), and *People v. Ward*, 101 Ill. 2d 443, 451 (1984)). However, a manslaughter instruction should not be given where the evidence shows that the homicide was murder, not manslaughter. *People v. Arnett*, 217 Ill. App. 3d 626, 634 (1991) (citing *People v. Simpson*, 74 Ill. 2d 497 (1978)).

¶ 86　　Although a defendant "is entitled to an involuntary manslaughter instruction if there is 'slight' evidence upon which a given theory could be based, there must be some evidence of the reckless conduct." *People v. Eason*, 326 Ill. App. 3d 197, 209 (2001) (citing *People v. Trotter*, 178 Ill. App. 3d 292, 298 (1988)). The appellate court has held that

> "[c]ertain factors may suggest whether a defendant acted recklessly and whether an involuntary manslaughter instruction is appropriate: disparity in size and strength between the defendant and the victim, the severity of the victim's injuries, whether the defendant used his bare fists or a weapon, whether there were multiple wounds, or whether the victim was defenseless." *Id.* (citing *DiVincenzo*, 183 Ill. 2d at 251).

Conversely, "Illinois courts have consistently held that when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not merely reckless and does not warrant an involuntary-manslaughter instruction." (Internal quotation marks omitted.) *People v. Sipp*, 378 Ill. App. 3d 157, 164 (2007).

¶ 87　　While we agree that a gun discharging during a struggle may be indicative of recklessness, there was no evidence in the record that would tend to show that the gun accidentally discharged during a struggle. The evidence in this case showed that Officer Francis's gun had two internal safeties and could not fire unless the trigger was pulled. Additionally, there was no evidence presented that would tend to show that defendant and Officer Francis were struggling over the gun itself. Instead, the witnesses who saw the struggle at the time of the initial gunshot testified that Officer Francis was getting up from the ground and holding his open and empty hands by his face when defendant fired the gun. The evidence also showed that defendant shot Officer Francis two more times after the initial gunshot, and there was evidence that Officer Francis was on the ground at the time of those gunshots based on abrasions on his back and "flattening" on one of the bullets. There was also evidence that defendant then shot at the responding officers, and tried to hide under Officer Francis's vehicle to evade apprehension. This context to the offense belies any suggestion that defendant's actions were merely "reckless" or that defendant accidentally shot Office Francis during a struggle.

¶ 88　　In these circumstances, we find no evidence from which the jury could have found defendant's conduct to be merely reckless. Given the evidence that was presented in the trial court, we conclude that the trial court did not abuse its discretion in denying defendant's request for an instruction on involuntary manslaughter.

¶ 89　　Defendant next contends that the trial court erred in refusing to allow defense counsel to impeach witness Donna Barney regarding the State having paid for her to stay in a hotel so that she could be available for trial. She specifically asserts that where Barney "recanted her

pre-trial statement that she saw Officer Francis put [defendant] in a headlock, it was unfair to deny the defense the opportunity to elicit a potentially pro-State bias."

¶ 90    On questions of the admissibility of evidence, we will not substitute our judgment for that of the trial court unless the record clearly shows the trial court abused its discretion. *People v. Cookson*, 215 Ill. 2d 194, 213 (2005) (citing *Ward*, 101 Ill. 2d at 455-56). As stated, an abuse of discretion occurs "only where the [trial court's] ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Phillips*, 392 Ill. App. 3d 243, 272 (2009).

¶ 91    As defendant points out, the credibility of a witness may be attacked by any party, including the party calling the witness. Ill. S. Ct. R. 238 (eff. Apr. 11, 2001). The confrontation clause of the sixth amendment of the United States Constitution (U.S. Const., amend. VI) guarantees a defendant the right to cross-examine a witness against him for the purpose of showing the witness's bias, interest, or motive to testify falsely. *People v. Harris*, 123 Ill. 2d 113, 144 (1988) (citing *Davis v. Alaska*, 415 U.S. 308 (1974)). The confrontation clause, however, does not prevent the trial judge from imposing limits on defense counsel's inquiry into potential bias of a witness, and a trial judge retains wide latitude to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or of little relevance. *People v. Kliner*, 185 Ill. 2d 81, 134 (1998) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), and *Harris*, 123 Ill. 2d at 144). As the United States Supreme Court observed in *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985), "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis omitted.) "[P]otential limitations on a defendant's right to cross-examine a witness as to bias, interest or motive to testify falsely are clearly rooted in the relevancy concepts of materiality and probative value." *People v. Green*, 339 Ill. App. 3d 443, 455 (2003). While a defendant in a criminal prosecution has the right to cross-examine a witness regarding her bias, interest, or motive to testify falsely, the evidence used to impeach the witness must give rise to the inference that the witness has something to gain by her testimony. *People v. Leak*, 398 Ill. App. 3d 798, 822 (2010) (citing *People v. Sims*, 192 Ill. 2d 592, 624-25 (2000), and *People v. Triplett*, 108 Ill. 2d 463, 475-76 (1985)). Thus, the evidence used to establish bias must be timely, unequivocal, and directly related and may not be remote or uncertain. *Id.* (citing *Sims*, 192 Ill. 2d at 625). Evidence that is not relevant and that would only confuse or mislead the jury is also properly excluded. *People v. Averhart*, 311 Ill. App. 3d 492, 500 (1999). Moreover, the improper denial of a defendant's constitutional right to cross-examine a witness regarding bias does not always mandate reversal, but may be found to be harmless error. See *Kliner*, 185 Ill. 2d at 134 (citing *Van Arsdall*, 475 U.S. at 684).

¶ 92    Initially we disagree with defendant's characterization of Barney's trial testimony as "recant[ing] her pre-trial statement" about the headlock. Barney testified that at the time of her testimony—more than five years after the incident—she could not recall the exact details of what was happening when she looked back at defendant and Officer Francis. She acknowledged that she told the detective on the scene that she saw Officer Francis appear to place defendant in a headlock with his arm, and agreed that if it was in the detective's notes she said it, but testified that she did not have a specific recollection of the headlock at the time of her testimony. In these circumstances, Barney's trial testimony cannot fairly be described as a "recantation," but rather a lapse in memory.

¶ 93    The State contends that the proposed impeachment regarding Barney's housing was properly excluded as it would have "open[ed] an irrelevant line of inquiry that would have led to further complications and confusion." It asserts that the fact that it paid for Barney's hotel "did not give rise to an inference of bias where it was not given in consideration of her potential testimony, but rather to make her available for *the defense*." (Emphasis in original.) Defendant, however, argues that the defense did not ask the State to provide housing to Barney, and merely asked that she be made available for "an interview," which, defendant claims, "could have been done without providing any housing at all." Defendant, however, did not specify before the trial court, or this court, how Barney could have been made available either for an interview or for trial short of providing her with temporary housing.

¶ 94    In these circumstances, we find no abuse of discretion by the trial court in concluding that the proposed impeachment could confuse or mislead the jury, and in refusing to allow it. Given the wide discretion afforded to the trial court on questions of the admissibility of evidence, we do not find the trial court's ruling to be arbitrary, fanciful, or unreasonable. *Phillips*, 392 Ill. App. 3d at 272.

¶ 95    Nonetheless, even if we were to find any error in the trial court's restriction, we would find such error to be harmless. The only change in Barney's testimony that defendant contends could have been motivated by a "pro-State bias" is Barney's failure to remember her prior observation of a headlock. Although the trial court did not allow impeachment on this issue based on Barney's housing, defendant was allowed to impeach Barney through the use of her prior inconsistent statement. In fact, immediately following Barney's testimony, defense counsel called Detective Heerdt, who testified and confirmed that, during his interview with Barney after the incident, she told him that Officer Francis appeared to put defendant in a headlock with his arm. Accordingly, defendant was given sufficient opportunity to effectively impeach Barney's testimony, even if it was not "in whatever way, and to whatever extent" she wished. See *Fensterer*, 474 U.S. at 20.

¶ 96    Defendant disagrees, arguing that "the fact that the defense proved up this one prior inconsistent statement did nothing to even hint at the broader point of bias." However, as pointed out above, defendant has pointed to no other statement or testimony by Barney that allegedly was motivated by a "pro-State bias" as a result of her being provided with temporary housing. In these circumstances, we find that any alleged error in disallowing the proposed impeachment was harmless beyond a reasonable doubt.

¶ 97    Finally, defendant contends that the statute mandating a natural life sentence for the first degree murder of a peace officer conviction is unconstitutional as applied to her. Defendant argues that the mandatory life sentence violates the United States and Illinois Constitutions because it precluded any consideration of mitigating factors, including her medical condition as described above, her lack of prior convictions, and her "advanced age." Defendant raises an as-applied constitutional challenge, which is a legal question that we review *de novo*. *People v. Fisher*, 184 Ill. 2d 441, 448 (1998).

¶ 98    The eighth amendment, applicable to the states by the fourteenth amendment (see *Robinson v. California*, 370 U.S. 660, 666 (1962)), provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted" (U.S. Const., amend. VIII). Additionally, article I, section 11, of the Illinois Constitution of 1970 provides that "[a]ll penalties shall be determined both according to the seriousness of the

offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 99      All statutes carry a strong presumption of constitutionality and "the party challenging the statute bears a heavy burden of clearly establishing its constitutional infirmities. [Citation.] Any reasonable construction which affirms a statute's constitutionality must be adopted, and any doubt regarding a statute's construction must be resolved in favor of the statute's validity." *People v. Morgan*, 203 Ill. 2d 470, 486 (2003). We generally defer to the legislature in the sentencing arena

> "because the legislature is institutionally better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly. [Citation.] The legislature's discretion in setting criminal penalties is broad, and courts generally decline to overrule legislative determinations in this area unless the challenged penalty is clearly in excess of the general constitutional limitations on this authority." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005).

¶ 100      Section 5-8-1(a)(1)(c)(iii) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 2008)) mandates a sentence of natural life imprisonment for an adult offender when he or she is

> "found guilty of murdering a peace officer *** when the peace officer *** was killed in the course of performing his official duties, or to prevent the peace officer *** from performing his official duties, or in retaliation for the peace officer *** performing his official duties, and the defendant knew or should have known that the murdered individual was a peace officer."

¶ 101      Defendant, citing *People v. Miller*, 202 Ill. 2d 328, 338 (2002), argues that this statute violates the Illinois proportionate penalties clause as applied to her because the punishment "is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community" in light of her mitigating circumstances. She acknowledges that the offense was "serious and tragic" but contends that it was "not so abhorrent that it warrants the automatic imposition of the most severe sentence in Illinois."

¶ 102      As our supreme court has "repeatedly recognized," the legislature "has the power to prescribe penalties for defined offenses, and that power necessarily includes the authority to prescribe mandatory sentences, even if such sentences restrict the judiciary's discretion in imposing sentences." *People v. Huddleston*, 212 Ill. 2d 107, 129 (2004). "The rehabilitative objective of article I, section 11, should not and does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life." *People v. Taylor*, 102 Ill. 2d 201, 206 (1984).

¶ 103      As relevant to this case, the legislature has determined that the seriousness of the offense of murdering a police officer mandates a sentence of natural life imprisonment, such that "no set of mitigating circumstances" could properly allow for a lesser penalty. *Id.* This court has also noted that a statute that punishes more severely those persons who murder, or attempt to murder, a peace officer in the line of duty is justified because it serves a more specific purpose than simply deterring people from unlawfully killing. *People v. Henderson*, 354 Ill. App. 3d 8, 16 (2004) (citing *People v. Hill*, 199 Ill. 2d 440, 458 (2002)). Specifically:

"Police officers play a vital role in our society. The demands of their position regularly place officers in potentially violent and dangerous situations. The need to protect these officers and to punish more severely those who interfere with their duties is a determination that the legislature is in a better position than this court to make." *Id.* at 18.

¶ 104　　We also note that defendant's contention that a mandatory life sentence is unconstitutionally disproportionate in light of the mitigating circumstances is undermined by the record of the sentencing hearing, which suggests that the trial court would have imposed the same sentence, even if it had discretion. The record shows that, despite the mandatory sentencing scheme, the trial court reviewed the mitigating circumstances and determined that defendant had "earned" a natural life sentence and that her actions "warrant[ed] that sentence."

¶ 105　　In light of the above, we conclude that defendant's mandatory sentence of natural life for murdering a police officer does not shock the moral sense of the community and does not violate the proportionate penalties clause of the Illinois Constitution as applied to her. See *People v. Ybarra*, 2016 IL App (1st) 142407, ¶ 30.

¶ 106　　Based on the foregoing, we affirm the judgment of the circuit court.

¶ 107　　Affirmed.